Strafford
No. 98-718

## THE STATE OF NEW HAMPSHIRE

v.

## ROGER A. FORTIER

September 25, 2001

*Philip T. McLaughlin*, attorney general (*Ann M. Rice*, senior assistant attorney general, on the brief and orally), for the State.

*Stephen T. Jeffco, P.A.*, of Portsmouth (*Henry N. Starbranch, Jr.* on the brief and orally), for the defendant.

BRODERICK, J. The defendant, Roger A. Fortier, appeals his convictions on numerous sexual assault charges involving two young victims. He argues that the Superior Court (*Mohl*, J.) erred by failing to dismiss two indictments for aggravated felonious sexual assault (AFSA) alleging a "pattern" under RSA 632-A:2, III (Supp. 2000) because they: (1) were duplicitous; (2) infringed upon his right to a unanimous jury verdict; and (3) violated the State and federal constitutional prohibitions against double jeopardy. He also asserts that the evidence was insufficient to support six other indictments for AFSA, which allege that he used his position of authority to coerce the victims to submit to certain other sexual assaults under RSA 632-A:2, I(k) (Supp. 2000). We affirm.

I

The following facts were adduced at trial. In 1991, the defendant began serving as a priest at a Roman Catholic Church in Farmington. He met both victims, J.K. and A.Y., through their involvement with the church.

In February 1991, when he was eleven years old, J.K. began taking classes with the defendant to become an altar server. In January 1992, J.K. and his family lived with the defendant at the church rectory for approximately two weeks when their home was destroyed by fire. The defendant maintained a friendship with J.K.'s family, often socializing with them at their home.

J.K. frequently went to the rectory on Saturdays to help the defendant prepare the bulletins for mass. Eventually, the defendant asked him if he wanted to spend the night at the rectory. By January 1994, when he was fourteen years old, J.K. was spending two or three weekends a month at the rectory. The defendant took him out to dinner on weekends and occasionally during the week. He also bought him gifts, took him to the movies and gave him money.

The two would watch television together at the rectory and at times, the defendant would joke about his homosexual attractions. One evening in January 1994, while the defendant and J.K. were watching television, the defendant got up to go to bed and asked J.K. if he wanted a "blow job." Receiving no response, the defendant angrily said, "I guess not" and went to bed. The following weekend the defendant offered J.K. an alcoholic drink, which he accepted. The defendant played a pornographic movie and at some point began rubbing J.K.'s leg and groin area over his clothes. He pulled J.K.'s pants down and performed fellatio on him. J.K. said nothing because he was "kind of scared" and "didn't know what to think." The defendant told him that he should not tell anyone.

J.K. testified that over the course of the next year, the defendant subjected him to fellatio one to three times per month. He recalled the sexual assaults occurring in the upstairs living room, the guest bedroom and the master bedroom. He also testified that on occasion, the defendant showed him pornographic movies with heterosexual or homosexual themes. The only movie about which J.K. could remember any detail was the one playing at the time of the first assault.

J.K. stopped going to the rectory in February 1995, at which time the sexual assaults essentially ended. He did not tell anyone about them at the time they were occurring as he was fearful that no one would believe him because "[the defendant] was a friend of the family's [and was] a nice priest."

A.Y. first met the defendant through the church in late 1992 or 1993 when he was nine years old, and the defendant helped him prepare to receive his first communion. At twelve, he became an altar server.

The defendant was close to A.Y.'s family and spent evenings at their home watching television, socialized with A.Y.'s mother, and attended family birthday celebrations. The defendant often took A.Y. and his older brother shopping, out to eat and to the movies. At some point, A.Y.'s older brother began spending occasional nights at the rectory. Envious of his older brother, A.Y. asked the defendant if he could stay at the rectory as well. The defendant agreed, and in

May 1997, when A.Y. was thirteen years old, he began spending every weekend at the rectory. The defendant bought A.Y. clothes and gifts, allowed him to watch cable television, and took him to the movies and to various recreational activities. A.Y.'s mother testified that she allowed her sons to spend time at the rectory because she believed the defendant needed help with various activities due to a heart problem.

The defendant sexually assaulted A.Y. for the first time during one of his early overnight visits. While A.Y. was scratching his foot, the defendant suggested that he go to the master bedroom so the defendant could treat it with a spray or lotion. Once in the bedroom, the defendant applied lotion and began tickling A.Y. At some point, he briefly touched A.Y.'s "private area" over his clothes and said, "feels good, [doesn't] it?" He then kissed A.Y. on his lips. A.Y. said nothing because he felt scared, trapped and helpless. At some point, the defendant instructed A.Y. to remove his clothes, and A.Y., feeling obligated, complied. The defendant then performed fellatio on him and played a pornographic movie depicting homosexual activities.

The defendant subjected A.Y. to the same type of activity on every subsequent weekend throughout the summer and into the fall of 1997. A.Y. remembered that some assaults occurred in the master bedroom while a pornographic movie was playing, and he was able to describe the substance of several different movies. He also recalled assaults occurring in the guest bedroom of the rectory in early October, and on two occasions, on the couch in the upstairs living room. The last assaults occurred just prior to Halloween in October 1997 when the defendant, while showering with A.Y., performed fellatio on him and digitally penetrated his rectum.

A.Y. first disclosed the sexual assaults to his parents on October 26, 1997. The defendant was arrested, and once the allegations became public, J.K. disclosed to the police the past sexual assaults inflicted on him. The defendant was later indicted on sixteen counts of sexual assault, including: (1) two counts of AFSA alleging that he engaged in a pattern of sexual assault on each victim, see RSA 632-A:2, III; (2) six counts of AFSA alleging that he used his position of authority to coerce the victims to submit to sexual penetration, see RSA 632-A:2, I(k); and (3) eight counts of felonious sexual assault (FSA) alleging that he inflicted sexual penetration on persons who were thirteen years of age or older and under sixteen, see RSA 632-A:3, II (Supp. 2000).

The parties stipulated to a finding of guilt on six FSA counts, on the condition that the jury find the defendant guilty of the six

coercion AFSA counts because the latter counts encompassed the former. Following a five-day trial, the jury returned guilty verdicts on the two pattern counts, the six AFSA counts and the two FSA counts not encompassed by the AFSA counts. Stipulated findings of guilt were entered on the six remaining FSA counts. Only the defendant's convictions for the pattern AFSA and the coercion AFSA indictments are on appeal. During oral argument, the defendant sought relief for his FSA convictions as well. We, however, decline to review the FSA convictions because he challenged only the pattern and coercion indictments before the trial court and in his notice of appeal. *In re Estate of Cass*, 143 N.H. 57, 63 (1998) (issues must be raised before trial court to be preserved for appellate review); *State v. Blair*, 143 N.H. 669, 672 (1999) (issues absent in notice of appeal are not preserved for appellate review).

## II

On appeal, the defendant appears to assert several constitutional arguments concerning the facial validity of the pattern statute and the adequacy of the pattern indictments as pled. We, however, need only concern ourselves with his jury unanimity and double jeopardy arguments because he failed to preserve before the trial court his remaining constitutional arguments.

Issues must be properly presented to the trial court in order to preserve them for appellate review. *See State v. McAdams*, 134 N.H. 445, 446-47 (1991). This rule is "grounded in common sense and judicial economy," and allows the trial court to consider errors as they occur and to remedy them as necessary. *See id.* at 447 (quotation omitted).

At the close of the evidence, the defendant moved to dismiss the two pattern indictments. He asserted: (1) the indictments created a "problem with [jury] unanimity"; and (2) they encompassed the same time frame as the indictments alleging specific acts. He also argued that the State had to elect between pursuing the pattern indictments and the single-act FSA indictments because the legislature only intended to allow a pattern indictment in circumstances where a victim could not testify with any certainty as to when a particular assault occurred. The defendant presents the first two arguments to us for our review, but does not advance the last argument. Because the trial court was not alerted to any other claimed constitutional deficiency in the pattern statute or indictments, we do not consider the defendant's remaining constitutional claims.

## III

The defendant contends that the pattern indictments infringe upon his right to a unanimous jury verdict because they do not specify the particular predicate acts relied upon by the State to prove the "pattern of sexual assault." Because numerous sexual assaults were generally identified at trial, the defendant argues that the pattern indictments, as drafted, permitted the jury to find him guilty without unanimous agreement as to the particular acts comprising the pattern under RSA 632-A:2, III. We conclude, however, that the defendant was not entitled to jury unanimity on each predicate act within the pattern because conviction under the pattern statute requires only that the jury unanimously agree that a defendant engaged in the proscribed criminal pattern of behavior.

Because the defendant asserts no infringement of any right under the Federal Constitution in connection with his jury unanimity argument, we limit our review to his State constitutional claim. Jury unanimity as guaranteed to each criminal defendant in this State is a matter of constitutional and statutory law. *State v. Greene*, 137 N.H. 126, 128 (1993). Our State Constitution precludes the legislature from providing criminal juries "of a less number than twelve, nor [can it] provide that a number of the petit jury, less than the whole number, can render a verdict." *Id.* (quotation omitted). Further, "[t]he New Hampshire Criminal Code requires jury unanimity with respect to the presence of the elements of offenses in criminal cases as charged." *Id.* "Jurors must be unanimous . . . about what constitutes the essential culpable act committed by the defendant and prohibited by the statute. Where discrete factual predicates can provide alternative bases for finding an element of the offense to have been established, a defendant is entitled to jury unanimity as to the factual predicate supporting a finding of guilt." *Id.*

A continuous course of conduct crime, however, does not require jury unanimity on any specific, discrete act because "it is not the specific act that is criminalized." *People v. Whitham*, 45 Cal. Rptr. 2d 571, 579 (Ct. App. 1995) (quotation omitted). Rather, the *actus reus* is "a *series* of acts occurring over a substantial period of time, generally on the same victim and generally resulting in cumulative injury." *Id.* (quotation omitted). Therefore, the jury need only be unanimous in finding that a defendant engaged in a criminal course of conduct. *Id.*

 We review the pattern statute, RSA 632-A:2, III, to determine whether the "pattern of sexual assault" should be treated

like a "course of conduct," that is, whether the pattern itself is the sole *actus reus* element, or whether the individual acts of sexual contact underlying the pattern also constitute legal elements of the pattern crime. *See Richardson v. United States*, 526 U.S. 813, 817-18 (1999). If the former, then the defendant is entitled to unanimity only on the element that he engaged in a pattern of sexual assault as defined under the statute. *Id.* at 818. If the latter, however, he is entitled to unanimity on the underlying predicate acts comprising the pattern, *id.*; *People v. Higgins*, 11 Cal. Rptr. 2d 694, 698 (Ct. App. 1992), and we would then need to determine whether such right was compromised in this case, *cf. Greene*, 137 N.H. at 130.

The pattern statute reads:

> A person is guilty of aggravated felonious sexual assault when such person engages in a pattern of sexual assault against another person, not the actor's legal spouse, who is less than 16 years of age. The mental state applicable to the underlying acts of sexual assault need not be shown with respect to the element of engaging in a pattern of sexual assault.

RSA 632-A:2, III. The Criminal Code defines "pattern of sexual assault" to mean "committing more than one act under RSA 632-A:2 or RSA 632-A:3, or both, upon the same victim over a period of 2 months or more and within a period of five years." RSA 632-A:1, I-c (Supp. 2000). Accordingly, the pattern statute penalizes a person for engaging in a "pattern of sexual assault," which is the commission of at least two acts of sexual assault as described under 632-A:2 or 632-A:3 within a defined time frame. That individual acts of sexual assault are required for a "pattern" to occur under the statute, and that such acts would be unlawful under other sections of the Criminal Code, *see* RSA 632-A:2 (1996) (amended 1997, 1998, 1999); RSA 632-A:3 (1996) (amended 1997), does not remove the pattern statute from the course of conduct category of offenses. *See People v. Avina*, 18 Cal. Rptr. 2d 511, 514-15 (Ct. App. 1993).

Like other jurisdictions that have adopted pattern statutes for sexual assault similar to the one at issue, our legislature created RSA 632-A:2, III to respond to the legitimate concern that many young victims, who have been subject to repeated, numerous incidents of sexual assault over a period of time by the same assailant, are unable to identify discrete acts of molestation. *See Whitham*, 45 Cal. Rptr. 2d at 577; *People v. Longoria*, 862 P.2d 266, 270-71 (Colo. 1993); *People v. Calloway*, 672 N.Y.S.2d 638, 641-42 (Co. Ct. 1998). These young victims "may have no practical way of

recollecting, reconstructing, distinguishing or identifying by specific incidents or dates all or even any" of the acts of sexual assault. *Calloway*, 672 N.Y.S.2d at 642 (quotations omitted).

■ The focus of the pattern statute is to criminalize a continuing course of sexual assaults, not isolated instances. The essential culpable act, the *actus reus*, is the pattern itself, that is, the occurrence of more than one sexual assault over a period of time, and not the specific assaults comprising the pattern. Therefore, to secure a conviction under the pattern statute in a manner that preserves a defendant's right to a unanimous jury verdict, the jury must be unanimous on the statutory element that a defendant engaged in behavior constituting a pattern of sexual assault. The jury must unanimously agree that a defendant engaged in more than one act of sexual assault as described in RSA 632-A:2 and :3, but need not agree on the particular acts, provided that they find the requisite number of acts occurred during the statutory time period.

The dissent relies, in part, upon *State v. Patch*, 135 N.H. 127 (1991), to conclude that a defendant is entitled to jury unanimity on the specific acts of assault comprising the "pattern of sexual assault" under RSA 632-A:2, III. Because *Patch* reviewed an indictment that alleged a course of conduct involving several incidents of sexual assault on a child, the dissent analogizes it to the case at hand. As noted by the dissent, the *Patch* court struck down the course of conduct indictment in part because "the defendant is entitled to have a jury of his peers determine guilt or innocence based on a specific incident rather than a series of incidents," and it was "possible that not all of the jurors were considering the same act [alleged in the indictment] when they voted unanimously to convict." *Patch*, 135 N.H. at 129.

Our analysis, however, is entirely consistent with *Patch*. The dissent fails to note that while *Patch* reviewed an indictment alleging a course of conduct, the criminal statute underlying that charge proscribed a single act of sexual contact. *See* RSA 632-A:3, III. Indeed, by stating that "[e]ach act of sexual contact as defined by RSA 632-A:1, IV constitutes a separate offense [under RSA 632-A:3, III]," we specifically noted that the purpose of RSA 632-A:3, III is to criminalize a *single act* of sexual contact. *Patch*, 135 N.H. at 128. Thus, the statutory *actus reus* was a single act of sexual contact, requiring jury unanimity on that element.

■ In this case, however, the defendant stood charged under a statute proscribing a "pattern of sexual assault," not single acts of sexual contact or assault. Accordingly, we hold the defendant's right

to a unanimous jury verdict was not compromised by the State's failure to specify the particular predicate acts underlying the charged pattern indictments, or the trial court's failure to require unanimity on the particular acts underlying the pattern charges. *See Calloway*, 672 N.Y.S.2d at 642-43; *Whitham*, 45 Cal. Rptr. 2d at 580; *State v. Johnson*, 627 N.W.2d 455, 460-64 (Wis. 2001).

We do not decide today whether the State may simultaneously pursue convictions for a pattern of sexual assault under RSA 632-A:2, III and for individual sexual assaults under RSA 632-A:2 or :3 for acts perpetrated against the same victim during a common period of time. Although the defendant argued to the trial court that the State must elect between pursuing convictions for a pattern and pursuing convictions for individual acts of sexual assault, he did not present this argument on appeal. *State v. Colbert*, 139 N.H. 367, 370 (1995) (arguments not briefed are deemed waived).

## IV

The defendant further argues that the pattern indictments violate his right to be free from double jeopardy under both the New Hampshire and the United States Constitutions. Specifically, he contends that because the time frame alleged in the pattern indictments overlap several FSA indictments alleging specific incidents of sexual assault, they constitute the same offenses. Thus, he argues that sentencing him on both the pattern and FSA indictments "violates the double jeopardy protection against multiple sentences for the same offense."

The State contends that the defendant failed to preserve his double jeopardy argument. We disagree and interpret the defendant's argument before the trial court that the time frame in the pattern indictments overlapped certain single-act FSA indictments as adequate to preserve his double jeopardy challenge. *Cf. State v. Patch*, 135 N.H. 127, 128 (1991) (defendant sufficiently asserted constitutional duplicitous argument without using specific term "duplicitous"). We confine our review, however, to the defendant's double jeopardy claim under the State Constitution. While the defendant asserted in his brief that the indictments "violate the State and Federal constitutional provisions against double jeopardy," he failed to engage in a separate federal analysis or cite any federal constitutional provision. We will not expend judicial resources on undeveloped argument. *See State v. Laurent*, 144 N.H. 517, 521 (1999).

"Part I, Article 16 of the State Constitution protects an accused against multiple prosecutions and multiple punishments for the

same offense." *State v. Nickles*, 144 N.H. 673, 676 (2000) (quotation omitted). "[D]ouble jeopardy precludes the State from pursuing multiple charges in a single prosecution when the charges comprise the same offense and the State seeks multiple convictions and thus multiple punishments." *Id.*

We conclude that the defendant suffered no infringement upon his right to be free from double jeopardy because he was not sentenced on any FSA indictment alleging that he committed a sexual assault within the same time period as alleged in the pattern indictments. In responding to the defendant's motion to dismiss at the close of evidence, the trial court acknowledged a potential "double jeopardy problem" and ruled that regarding the J.K. pattern indictment, it "intend[ed] to instruct the jury . . . that the Indictments of the facts required to be proved in the pattern Indictment may not include any acts that occurred in May of 1994 because those acts are in the time frame of another Indictment." In its charge to the jury on the A.Y. and J.K. pattern indictments, the trial court explained: "[T]he State must prove the pattern of sexual assault in each of those . . . pattern sexual assault indictments by acts other than the individual acts which are set forth in any of the other individual indictments." The defendant did not object to this instruction, and fails to identify on appeal any reason why the jury charge was inadequate to address his double jeopardy concern. Because the jury is presumed to follow the instructions given by the court, *see State v. Ellard*, 95 N.H. 217, 221 (1948), *cert. denied*, 335 U.S. 904 (1949), it could not have rendered guilty verdicts on the pattern indictments by relying upon any individual sexual assault charged in the FSA indictments. Accordingly, the defendant's double jeopardy argument fails.

We decline to construe as a separate double jeopardy argument the defendant's passing reference in his brief to "the double jeopardy violation in charging both the pattern sexual assaults and the individual sexual assault." To the extent he attempts to assert a distinct argument additional to his challenge to incurring multiple punishments for the same offense, the argument was not sufficiently developed for appellate review. *Laurent*, 144 N.H. at 521.

V

Finally, the defendant argues that the trial court erred in allowing the AFSA coercion indictments to go to the jury because there was insufficient evidence to support a finding that he was in a position of authority over his young victims, which he used to coerce them to

submit to sexual assaults. The evidence belies the defendant's argument.

To succeed on a sufficiency of the evidence claim, a defendant "must show that, viewing the evidence in the light most favorable to the State, no rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Carter*, 140 N.H. 114, 116 (1995). All reasonable inferences derived from the evidence are drawn in the light most favorable to the State. *State v. Collins*, 129 N.H. 488, 489 (1987).

"A person is guilty of the felony of aggravated felonious sexual assault if he engages in sexual penetration with another person . . . [w]hen, except as between legally married spouses, the victim is 13 years of age or older and under 18 years of age and the actor is in a position of authority over the victim and uses this authority to coerce the victim to submit." RSA 632-A:2, I(k). We have construed the term "authority" to mean: "power to require and receive submission: the right to expect obedience: superiority derived from a status that carries with it the right to command and give final decisions." *Carter*, 140 N.H. at 116 (quotation omitted).

The defendant argues that the evidence failed to establish that his position as a priest provided him any express or implied power to require or receive submission, the right to expect obedience or the right to command or give final decisions over the victims. He contends that "the record reflects no indicia of authority over the victim, J.K." and "relative to A.Y. there is not even an attempt to develop 'authority.'" We conclude, however, that the jury had ample evidence before it to find that the defendant was in a position of authority over the victims at the time the charged sexual assaults occurred.

Both victims became altar servers under the defendant's direction and, as such, were obligated to assist him by performing various tasks during Mass. These tasks included delivering "the chalice and the book" to the defendant in his role as priest, as well as washing his hands during the celebration of the Mass. A.Y. testified that he became an altar server to become "closer to God." On Saturdays, during the different time periods relevant to each victim, both boys frequented the rectory where the defendant resided to help him prepare the bulletins for Mass. The victims were thirteen and fourteen years old when the defendant began assaulting them and fourteen and fifteen when he ceased. Both remained involved in the church in which the defendant was the religious leader throughout the time the assaults occurred.

■ We conclude that the defendant's role as the victims' personal religious leader, and their subservient role as his altar servers, sufficiently established the defendant's right to expect obedience and power to receive submission from the victims. Accordingly, a rational jury could have found beyond a reasonable doubt that the defendant maintained a position of authority over the victims at the time of the charged assaults.

The defendant further argues that the evidence failed to support the charge that he used his position of authority to coerce the victims to submit. He argues that the evidence demonstrated that he seduced the victims through friendship, gifts, alcohol, and pornographic materials, which would support a conviction under RSA 632-A:3, II, criminalizing the adult sexual exploitation of minors, but not under RSA 632-A:2, I(k).

■ "Coercion," as used in RSA 632-A:2, I(k), is not defined in the Criminal Code. We have ascribed a broad meaning to the term, relying upon the dictionary definition which "defines the term 'coerce' to mean 1: to restrain, control or dominate, nullifying individual will or desire . . . 2: to compel an act or choice by force, threat, *or other pressure* . . . 3: to effect, bring about, establish, or enforce by force, threat, *or other pressure*." *Collins*, 129 N.H. at 490 (quotation omitted). We have specifically held that "[a] person in a position of authority who uses such authority in any way to coerce the child's submission to sexual activity is subject to prosecution . . . whether the coercion involves undue influence, physical force, threats, or any combination thereof." *Id.* at 490-91. Coercion need not be overt, but may consist of "the subtle persuasion arising from the position of authority." *Carter*, 140 N.H. at 117 (quotation omitted). With this standard in mind, we turn to the evidence that was before the jury.

The defendant used his religious position to develop a relationship of trust with the victims and their families, and thereby gain unsupervised access to the boys. Prior to assaulting the victims, the defendant befriended their families, socializing at their homes on a regular basis. In the case of A.Y., the defendant spent time at his house almost every day, eating dinner, watching television, socializing in the mornings with his mother, and attending family birthday celebrations. J.K. testified that the defendant was the "best of friends" with his father, and that the defendant had spent evenings at their home socializing with his family.

During the time period relevant to each victim, the defendant lavished each boy with his time and money prior to initiating the

first assault. He took each victim out to eat, shopping and to other recreational activities, and gave them gifts and money. A.Y., in particular, testified that he received attention from the defendant that he did not receive from his family. By the time the defendant first assaulted each victim, he had created an environment through the use of his religious position that made it difficult for them to reject his sexual advances.

The evidence makes it nearly impossible to divorce the defendant's position of authority from his interactions with the victims. The victims met the defendant through his role as the priest of the church they attended with their families. He prepared both boys to become altar servers, and prepared A.Y. for his first communion. As altar servers, A.Y. and J.K. assisted the defendant at Mass throughout the time that the defendant befriended their families and while they were subjected to his sexual assaults. In fact, A.Y. regularly served as an altar server under the defendant during the weekends he stayed at the rectory and was subjected to the defendant's sexual demands. Both boys helped the defendant with church administrative duties during the time period they were assaulted by him. Finally, both boys testified that they remained silent for a length of time in part because the defendant was a priest.

■ We conclude that the evidence supports a finding that the defendant used his respected position of authority to employ a tactic of manipulation and exertion of subtle pressure to succeed in sexually assaulting each boy. Accordingly, we conclude that a rational jury could have found beyond a reasonable doubt that the defendant used his position of authority to coerce the victims to submit to his sexual assaults.

*Affirmed.*

NADEAU and DALIANIS, JJ., concurred; HORTON, J., retired, specially assigned under RSA 490:3, concurred; GROFF, J., superior court justice, specially assigned under RSA 490:3, dissented.

GROFF, J., superior court justice, specially assigned under RSA 490:3, dissenting. The majority concludes today that a defendant charged with violating RSA 632-A:2, III is not entitled to a unanimous jury verdict on the individual predicate acts of sexual abuse constituting the pattern of abuse. Because I believe that this decision infringes upon a defendant's constitutional right to jury unanimity, I respectfully dissent from part III of this opinion.

Jury unanimity is guaranteed under our State Constitution. *See State v. Greene*, 137 N.H. 126, 128 (1993). The Criminal Code also

expressly provides that "[n]o person may be convicted of an offense unless each element of such offense is proved beyond a reasonable doubt." RSA 625:10 (1986). In rendering its opinion, the majority designates the "pattern" of sexual assault as the element that a jury must unanimously find to have occurred beyond a reasonable doubt. The court argues that the jury need not agree unanimously on what underlying acts of sexual assault make up the "pattern" because the acts are merely the means by which the "pattern" element is to be proven.

To justify this conclusion, the majority labels RSA 632-A:2, III as a course of conduct crime, defining the *actus reus* as the "pattern" of sexual assault. As a result, the court reasons that jury unanimity is not required with respect to the predicate acts of sexual assault because it is the "pattern" and not the specific acts that are being criminalized. I agree that based upon the language of RSA 632-A:2, III, the "pattern" is the element that the jury must unanimously find to have occurred beyond a reasonable doubt. I disagree, however, that the underlying acts of sexual assault are not the acts that are being criminalized.

It is a matter of fundamental criminal law that "[a] person is not guilty of an offense unless his criminal liability is based on conduct that includes a voluntary act or the voluntary omission to perform an act of which he is physically capable." RSA 626:1 (1996). *Actus reus* translated means the "guilty act," and is defined as "[a] wrongful deed that comprises the physical components of a crime and that generally must be coupled with *mens rea* to establish criminal liability." BLACK'S LAW DICTIONARY 37 (7th ed. 1999). The "pattern" of sexual assault is not an act at all, but is rather a culmination of a series of voluntary acts of sexual assault. Thus, the *actus reus* is the voluntary commission of an act of sexual assault, not the "pattern" that results from it.

It is true that an indictment alleging a course of conduct is not duplicitous if continuous acts or omissions constitute the offense. *See State v. Rodney Portigue*, 125 N.H. 352, 360-61 (1984). It is also true that the Criminal Code and the New Hampshire Constitution explicitly require jury unanimity only with respect to the elements of criminal offenses. *See State v. Greene*, 137 N.H. at 126. Nevertheless, to hold that jury unanimity is not required with respect to the specific acts of sexual assault constituting the "pattern" offense merely because the statute criminalizes a course of conduct rather than a single act ignores the true nature of the crime.

As the Court stated in *Greene*:

> Jurors must be unanimous . . . about what constitutes the essential culpable act committed by the defendant and prohibited by the statute. Where discrete factual predicates can provide alternative bases for finding an element of the offense to have been established, a defendant is entitled to jury unanimity as to the factual predicate supporting a finding of guilt.

*Id.* The concept of a "pattern" of sexual assault is simply that more than one act of sexual assault was committed upon the same victim over a specific period of time. *See* RSA 632-A:2, III. The "pattern" element of sexual assault has no independent significance or existence without the underlying acts of sexual assault. Certainly, these predicate acts must at least be considered alternative bases for establishing the "pattern" element. As a result, the defendant is entitled to jury unanimity as to the specific factual predicates supporting the "pattern."

Moreover, this court has recognized the prejudice occasioned to defendants charged with multiple acts of sexual assault of children, requiring that specific acts be charged and that the jury be unanimous in its verdict on each act. *See State v. Patch*, 135 N.H. 127, 129 (1991). In *Patch*, the court held that an indictment alleging a course of conduct involving several incidents of sexual assault on a child was unconstitutionally duplicitous because it was "possible that not all of the jurors were considering the same act when they voted unanimously to convict." *Id.* at 129. The court also stated that "the defendant is entitled to have a jury of his peers determine guilt or innocence based on a specific incident, rather than a series of incidents." *Id.* In addition, the court advised the State that it was required to bring "several indictments, each alleging a specific incident and consolidate them for trial." *Id.*

By labeling RSA 632-A:2, III as a course of conduct crime, the court abandons the concerns raised in *Patch* by effectively allowing duplicitous indictments. Consequently, juries will be allowed to convict a defendant without reaching a unanimous verdict on the individual acts of sexual assault comprising the "pattern." This creates the anomalous result that a defendant may be convicted of the crime of committing two or more acts of sexual assault when the jury could not unanimously agree that he had committed any sexual assault at all.

The majority expresses its concern that, as a practical matter, it is extremely difficult to prosecute multiple incidents of sexual abuse

against young children given that children have trouble identifying and separating the discrete acts of molestation. Nevertheless, while I recognize that there may be public policy concerns supporting the rule adopted by the majority today, the constitutional requirement of a unanimous verdict should not be sacrificed for the sake of expediency.

For the above reasons, I respectfully dissent.