Merrimack
No. 2001-379

THE STATE OF NEW HAMPSHIRE

v.

JEFFERY A. GREY

Argued: October 2, 2002
Opinion Issued: December 17, 2002

*Philip T. McLaughlin,* attorney general (*Laura E. B. Lombardi,* attorney, on the brief and orally), for the State.

*David M. Rothstein,* deputy chief appellate defender, of Concord, by brief and orally, for the defendant.

NADEAU, J. The defendant, Jeffery A. Grey, appeals an order denying his motion to suppress the fruits of an allegedly unconstitutional entry and custodial interrogation, which resulted in his three convictions for

possession of controlled substances after a bench trial in the Superior Court (*McGuire*, J.). *See* RSA 318-B:2, :26, II(a) (1995). We affirm.

The record supports the following facts. On July 11, 1999, the defendant was staying at his grandparents' home located at 70 Centre Street in Concord, while his grandparents were on an extended vacation in Greece. Unknown to the defendant, prior to their departure, his grandparents had requested the Concord Police Department (CPD) to watch their home while they were away. With this request, the defendant's grandparents gave the CPD a list of people who were authorized to be in the house and who were to be contacted in an emergency. The list included a neighbor and three of the grandparents' children. The list, however, did not include the defendant.

While the grandparents were out of the country, the CPD conducted weekly "vacant house checks" on the premises, during which a CPD officer would walk around the house, check all of the doors to make sure they were closed and locked, and look for anything out of the ordinary. On Sunday, July 11, CPD Officer Jason Wimpey was assigned to conduct the "vacant house check." As he walked around the premises, Officer Wimpey noticed the garage door was open and the back door to the home was unlocked. On prior checks both had been closed and locked.

Suspecting a potential break-in or the presence of an intruder, Officer Wimpey called for backup to assist him in securing the home. When his backup officer arrived, both officers entered the house through its unlocked back door to look for an intruder or evidence of a break-in. Neither officer, however, called an emergency contact number about this potential break-in.

Upon entry, the officers found the defendant sleeping on a sofa and woke him to learn his identity. The defendant explained that he was the homeowners' grandson visiting the home with his mother, who was at the races in Loudon. Upon the officers' request for identification to confirm his story, the defendant gave them his passport. When Officer Wimpey opened the defendant's passport, he found two small packets of white powder, which he suspected were illegal drugs.

The officers asked the defendant if he had any more contraband in the house and the defendant told them he did not, denying that he even owned the white powder in his passport. The defendant then told the officers they could look around for further contraband. When the officers searched the area immediately around where the defendant had been sleeping, the officers found a glass pipe in the pocket of his pants, which were lying on the floor. Upon finding this pipe, the officers again asked the defendant if there was any more contraband in the house. This time, the defendant replied there was further contraband in his bedroom. The officers placed

the defendant in handcuffs and he led them upstairs to his bedroom, where they found more drugs and drug paraphernalia. The officers arrested the defendant for possession of the controlled substances and this criminal prosecution followed.

At trial, the defendant moved to suppress evidence of the drugs as fruit of an unconstitutional warrantless entry into his grandparents' home. The defendant also moved to suppress the statements he made after producing his passport as products of an unlawful custodial interrogation. After a hearing, the trial court ruled that the warrantless entry was consensual based upon the homeowners' request that the police watch their home. The trial court further ruled that the defendant was not entitled to the protections of *Miranda v. Arizona*, 384 U.S. 436 (1966), because he was not subjected to a custodial interrogation until after he already had incriminated himself and been placed under arrest. The defendant challenges each of these rulings.

"Our review of the superior court's order on a motion to suppress is *de novo*, except as to any controlling facts determined at the superior court level in the first instance." *State v. Sawyer*, 147 N.H. 191, 193 (2001) (quotation omitted), *cert. denied*, 123 S. Ct. 107 (2002). Neither party disputes the trial court's factual finding that the warrantless entry into the house lacked the express consent of the homeowners, nor do they challenge its finding that an interrogation occurred. Therefore, we decide only whether the totality of the circumstances establish implied consent by looking at whether the "[homeowners'] conduct unambiguously manifested consent to enter." *State v. Sawyer*, 145 N.H. 704, 708 (2001). If so, we then will decide whether the defendant legally was "in custody" during his alleged unlawful interrogation. *See State v. Graca*, 142 N.H. 670, 675 (1998).

The defendant first argues his grandparents' request that the CPD watch their home during their absence did not unambiguously manifest an implied consent to enter their home in the event of a break-in. Rather, the defendant claims the CPD should have called one of the emergency contacts on the list his grandparents left with the CPD before entering their home. We disagree.

■ Since the defendant relies solely upon the New Hampshire Constitution, we base our decision upon the State Constitution, using federal cases only to aid our analysis. *See State v. Baroudi*, 137 N.H. 62, 64 (1993). Our State Constitution protects all people, their papers, their possessions and their homes from unreasonable searches and seizures. *See* N.H. CONST. pt. I, art. 19. It particularly protects people from unreasonable police entries into their private homes, because of the

heightened expectation of privacy given to one's dwelling. *See State v. Seavey*, 147 N.H. 304, 307 (2001). Consensual entries, however, are reasonable under our constitution, whether the consent to enter is granted expressly through words or impliedly through conduct. *See Sawyer*, 145 N.H. at 706-07.

When the State seeks to establish implied consent to enter through a homeowner's conduct, it must prove by a preponderance of the evidence that the homeowner's conduct unambiguously manifested consent to enter. *See id.* at 708. This burden is satisfied if the State objectively shows the totality of the circumstances would cause a reasonable police officer to believe he was authorized to enter. *See id.* at 707-08. The circumstances surrounding a homeowner's grant of consent also limits the scope of any search authorized by that consent. *See State v. Diaz*, 134 N.H. 662, 666 (1991).

■ The trial court found the circumstances surrounding the homeowners' request showed implied consent to a police entry into their home to investigate criminal conduct. This finding is supported in the record. The homeowners gave the CPD the names of four people who were authorized to be in the house while they were away. Three were family members, and one was a neighbor who would be checking the mail. The homeowners gave the CPD no other instructions or limitations on their watch over 70 Centre Street.

■ After conducting several weekly checks and finding all doors to the home secure, it would have been objectively *unreasonable* for Officer Wimpey not to have entered this vacant home when he found its doors open and unsecured. *See* 3 W. LAFAVE, SEARCH & SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 6.6(b), at 403-07 (3d ed. 1996 & Supp. 2002) (citing cases). We concur with the courts from other jurisdictions which find it both impractical and unreasonable to expect a police officer reasonably believing a burglary is in progress to ignore his duties of crime prevention by stopping to find someone to give permission to enter the home and secure the property. *See id.* (citing jurisdictions); *see also Bilida v. McCleod*, 211 F.3d 166, 171 (1st Cir. 2000); *United States v. Tibolt*, 72 F.3d 965, 970-71 (1st Cir. 1995) (listing cases), *cert. denied*, 518 U.S. 1020 (1996). Furthermore, the officers in this case carefully limited the scope of their search to a protective sweep for intruders and limited the scope of their initial questioning to discovery of the defendant's identification.

The defendant next argues he was entitled to *Miranda* warnings after the drugs fell from his passport and the police asked him if they could search the house. The defendant argues that, by that time, he was in custody because the police had formed the intent to arrest him for

possession of drugs and he was not free to leave. The defendant asserts that all of his statements made without *Miranda* protections, therefore, must be suppressed. *See State v. Graca*, 142 N.H. at 675.

For *Miranda* warnings to apply, the police must have a defendant both in custody and under interrogation. *See id.* The parties here agree the police interrogated the defendant. We will not overturn the trial court's factual findings relating to custody unless they are contrary to the weight of the evidence. *See State v. Hammond*, 144 N.H. 401, 403 (1999). We do, however, review its ultimate legal determination of custody *de novo*. *See id.*

■ For the defendant to be in custody and entitled to *Miranda* protections before questioning, he must be either formally arrested or restrained in his freedom of movement to the degree associated with a formal arrest. *See Graca*, 142 N.H. at 675. This determination must be based upon how a reasonable person in the defendant's position would have understood the situation. *See id.* To determine whether a reasonable person in the defendant's position would think he or she was in custody under this standard, the trial court reviews the totality of the circumstances of the encounter, including "the suspect's familiarity with his surroundings, the number of officers present, the degree to which the suspect was physically restrained, and the interview's duration and character." *Id.* (quotation omitted).

■ In this case, the trial court thoroughly analyzed each of these considerations when it determined the defendant was not in custody until after he had incriminated himself. A review of the record amply supports this ruling. The defendant made his statements in the familiar environment of his grandparents' home to two officers who had explained their presence. Additionally, the defendant made his statements after previously denying any knowledge of the drugs in his passport and inviting the police to search the house. Finally, the defendant's incriminating statements were made while he was engaged in a cordial conversation with the police officers about the countries that his passport showed he had visited.

The trial court found, and we agree, that these facts would not make a reasonable person feel restrained to the degree of formal arrest. Upon denying a connection with the contraband and beginning a new conversation about global travel, a reasonable person would not feel restrained in that person's grandparents' home. The defendant here was taken into custody only upon being handcuffed after incriminating himself

and disclosing the location of his contraband. *See, e.g., State v. Johnson,* 140 N.H. 573, 579 (1995).

*Affirmed.*

BROCK, C.J., and DALIANIS and DUGGAN, JJ., concurred.