Hillsborough-southern judicial district
No. 2006-254

### THE STATE OF NEW HAMPSHIRE

v.

### JEREMY JENNINGS

Argued: April 5, 2007
Opinion Issued: August 8, 2007

*Kelly A. Ayotte*, attorney general (*Nicholas Cort*, assistant attorney general, on the brief and orally), for the State.

*James T. Brooks*, assistant appellate defender, of Concord, on the brief and orally, for the defendant.

DUGGAN, J. This is an interlocutory appeal from two rulings of the Superior Court (*Groff*, J.), one granting a motion to suppress statements filed by the defendant, Jeremy Jennings, and the other granting his motion to dismiss two sexual assault indictments. *See* SUP. CT. R. 8. We affirm in part, reverse in part, and remand.

*I. Suppression*

After a suppression hearing during which the court heard testimony from several witnesses, including the defendant, the court found the following facts: On March 15, 2005, Sergeant Raymond Jackson of the Milford Police Department spoke with H.J., a minor, concerning allegations that her father, the defendant, had sexually assaulted her. The following day, Jackson learned that the defendant would be arriving at approximately 3:30 p.m. at 17 Cedar Street in Hudson ("the residence") to

pick up his children. During a meeting, Jackson, Lieutenant William Avery and Detective Matthew Keller of the Hudson Police Department, and Assistant County Attorney Roger Chadwick decided that Jackson and Keller would approach the defendant at the residence and try to get him to speak with them "voluntarily." As such, it was determined that the defendant would not be read his *Miranda* rights.

Jackson and Keller drove to the residence in an unmarked police cruiser and positioned themselves on a side street across from the residence. Lieutenant Avery and Chadwick parked approximately four houses away on the opposite side of the street.

Shortly thereafter, the defendant arrived in a pick-up truck and parked in the driveway. Jackson and Keller pulled their cruiser up, parked to the side of the driveway, and got out of the vehicle. The defendant got out of his truck. Jackson approached the defendant, identified himself, and displayed his badge, while Keller remained at the cruiser. Jackson told the defendant that he would like him to come to the Hudson police station so that he could ask him some questions. Jackson told the defendant that "it was voluntary" as to whether he went to the police station. The defendant asked why Jackson wanted to speak with him. Jackson replied that he could not explain at that moment, but that it had to do with the welfare of the defendant's children. The defendant then inquired about where his children were and Jackson indicated that they were in a "safe place." The defendant testified that he thought he was required to go with Jackson.

The defendant twice asked Jackson if he could follow him to the police station in his truck. Both times Jackson replied that it would be better if the defendant went in the unmarked police cruiser with himself and Keller. He instructed the defendant to turn off his truck, leave both of his cellular telephones in the truck, take the keys out and lock the doors. The defendant complied. Jackson then took the defendant's truck keys and gave them to Keller. Jackson testified that throughout this interaction the defendant appeared calm and was agreeable.

Subsequently, Keller conducted a patdown search of the defendant and asked him to remove all of the items in his pockets. Following the patdown, Keller returned all of the items to the defendant except for the keys to the truck. Keller then opened the door to the unmarked police cruiser and told the defendant that he could take the front seat and Jackson would sit in the back. Keller and Jackson then transported the defendant to the Hudson police station.

Upon arrival at the police station, the cruiser entered the garage and the door closed behind it. Keller opened the cruiser door for the defendant and escorted him directly to a small interview room, containing one square table and three chairs. Throughout the interview, the defendant sat in a

chair across from the door. Although the door was initially open, it was closed throughout the interview.

Jackson sat in a chair across from the defendant. He testified that he informed the defendant that he was not under arrest and was free to leave at any time. However, the trial judge found that "there was no evidence indicating that the defendant understood this to be true." Jackson also testified that he informed the defendant that the interview would be recorded. However, the recording system was not turned on until shortly after the interview began, so these preliminary statements were not recorded.

Jackson asked the defendant if he would like some water and the defendant replied that he would not. Jackson then questioned the defendant about H.J.'s allegations. Throughout the interview, Jackson confronted the defendant with H.J.'s allegations and indicated that he believed them. During the interview, the defendant made incriminating statements.

After approximately one hour, Jackson left the interview room. Before doing so, he told the defendant that if he needed anything he could "give a little whack" on the door. He also told the defendant that he would be leaving the door closed but if the defendant wanted, he could open the door. The defendant was not told that he could leave the room.

Detective Forgione of the Nashua Police Department then interviewed the defendant for approximately thirty-five to forty minutes. Upon entering the room, Forgione closed the door and told the defendant, "you know that this video is being taped." The defendant indicated that he did. Detective Forgione then stated, "and you were told you could leave at any time." The defendant replied affirmatively. The trial court found Forgione's statement, which was videotaped, to be "more of an off-handed comment rather than an indication that the defendant was actually free to leave at any time."

During the interview, Forgione sat in a chair next to the defendant but in front of the door. He confronted the defendant with H.J.'s allegations, frequently indicating that he had no doubt "that something happened in Nashua." The defendant made incriminating statements to Forgione.

At the close of the interview, Forgione told the defendant "to just hang out." Forgione then left the interview room and closed the door. The defendant was not advised that he could leave the room. He was subsequently arrested, and at approximately 6:35 p.m. that same evening, was transported to the Milford police station. He was eventually indicted on five counts of sexual assault.

The defendant moved to suppress the statements made to Sergeant Jackson and Detective Forgione, arguing that the detectives violated Part

I, Article 15 of the New Hampshire Constitution and the Fifth and Fourteenth Amendments of the United States Constitution by subjecting him to a custodial interrogation without informing him of his rights as required by *Miranda v. Arizona*, 384 U.S. 436 (1966). The court agreed.

On appeal, the State argues that the trial court's conclusion that the defendant was in custody is erroneous. The State argues that the critical factor in the custody determination should be that the defendant was told at the outset and later reminded that he was free to leave, and specifically asks us to overturn the trial court's finding that Forgione's statement "and you were told you could leave at any time" was an offhand comment rather than an actual indication that the defendant was free to leave. We agree with the trial court that we cannot "turn a blind eye toward a custodial relationship simply because the police ma[d]e a thinly veiled attempt to clothe their custody of the defendant in the language of voluntariness." Accordingly, we affirm its ruling.

 We first address the issue under the New Hampshire Constitution, referring to federal opinions for guidance only. *State v. Ball*, 124 N.H. 226, 231-33 (1983). "Custody entitling a defendant to *Miranda* protections requires formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *State v. Turmel*, 150 N.H. 377, 382-83 (2003) (citation omitted). In the absence of formal arrest, we must determine whether a suspect's freedom of movement was sufficiently curtailed by considering how a reasonable person in the suspect's position would have understood the situation. *Id.* "The location of questioning is not, by itself, determinative: a defendant may be in custody in his own home but not in custody at a police station." *State v. Johnson*, 140 N.H. 573, 578 (1995) (quotations and citations omitted). To determine whether a reasonable person in the defendant's position would believe himself in custody, the trial court should consider "the totality of the circumstances of the encounter, including 'the suspect's familiarity with his surroundings, the number of officers present, the degree to which the suspect was physically restrained, and the interview's duration and character.'" *State v. Grey*, 148 N.H. 666, 670 (2002) (quoting *State v. Graca*, 142 N.H. 670, 675 (1998)). "Because the ultimate determination of custody requires an application of a legal standard to historical facts, it is not merely a factual question but a mixed question of law and fact." *State v. Ford*, 144 N.H. 57, 62 (1999). Thus, we review the ultimate determination of custody *de novo*. *Id.* at 63.

We begin with the State's challenge to the trial court's factual findings. We will not overturn the trial court's factual findings relevant to the question of custody unless they are contrary to the manifest weight of the

evidence. *State v. Locke,* 149 N.H. 1, 6 (2002), *cert. denied,* 538 U.S. 1043 (2003).

After reviewing the transcript of the suppression hearing and the videotape of the defendant's interview we cannot conclude that the court's findings are contrary to the manifest weight of the evidence. In particular, with respect to the court's characterization of Forgione's statement "and you were told you are free to leave" as an offhand remark, the videotape confirms the nature of the remark, as well as the unlikelihood that, in the context in which it was made, it would have communicated to any reasonable person that he or she was actually free to leave. Just minutes before Forgione entered the room, Sergeant Jackson instructed the defendant that he could knock on the interview room's door if he needed anything. The implication of this statement was that the defendant could not leave the room, much less the station. Following this, Forgione's question as to whether the defendant had at an earlier time been told he was free to leave did not communicate that he was currently free to leave.

Having upheld the trial court's factual findings, we turn to the State's argument that the defendant was not in custody for purposes of the State Constitution. As noted above, custody determinations involve an examination of the totality of the circumstances, including, but not limited to, factors such as the number of officers present, the degree to which the suspect was physically restrained, the interview's duration and character, and the suspect's familiarity with his surroundings. *Grey,* 148 N.H. at 670. The trial court's order contains factual findings bearing upon these factors and other pertinent considerations.

For example, with respect to the number of officers present, the trial court found that two officers drove to the residence in an unmarked car and parked the car next to the driveway. One then approached the defendant and flashed his badge while the other waited near the car. In addition, another officer, joined by an assistant county attorney, was parked in a car across the street. The fact that three officers and a prosecutor went to meet the defendant certainly bolsters the trial court's custody determination.

Similarly, although the defendant may not have been placed in handcuffs or any similar device, he was restrained from early on in the encounter. After the police asked the defendant to come to the police station for questioning, they twice refused his request to follow them to the station in his own truck. Instead of allowing him to travel independently, Jackson instructed him to turn off his truck, remove the keys, leave his cellular telephones behind, and lock the doors. The police also patted him down and confiscated his keys. This stands in sharp contrast to *State v. Carpentier,* 132 N.H. 123, 127 (1989), where officers provided

transportation to the police station for the defendant's convenience, and *State v. Carroll*, 138 N.H. 687, 696 (1994), where the defendant drove himself to the police station. By denying the defendant access to his truck and phones, the police effectively ensured that he was dependent upon them for any further transportation or communication with the outside world.

Moreover, at the police station, the police continued to exert control over the defendant in a manner that limited his freedom. The defendant was brought into the station through a closed-door garage and escorted directly to an interview room. He was seated in the chair furthest from the door and the door was closed.

In addition to the fact that the defendant was whisked away to the unfamiliar surroundings of the police station, the duration and character of the encounter and interview suggest that he was in custody. During the initial encounter at the defendant's residence, the police informed him that they wished to speak with him about his daughter's welfare, giving no indication that a crime had been alleged or that he was suspected of any wrongdoing. Within minutes of being inside the interview room, however, Jackson confronted the defendant with his daughter's allegations of sexual assault and said he was certain she was telling the truth. Both Jackson and Forgione then repeatedly confronted the defendant in this manner. Coupled with the control exercised by the police from the beginning of the encounter, this clear indication that the police believed the defendant to be guilty of sexual assault would have signaled to a reasonable person that his freedom of movement was curtailed to the degree associated with formal arrest.

Furthermore, the police interviewed the defendant for nearly two hours in the closed-door, confined atmosphere of the interview room. *See Grey*, 148 N.H. at 670 (finding no custody where defendant made statements in "the familiar environment" of his grandparents' home); *State v. Goupil*, 154 N.H. 208, 226 (2006) (no custody where interview occurred in defendant's grandmother's home, "surroundings that were both comfortable and familiar" to defendant). There was no evidence that during his time at the police station, the defendant was actually free to move about the station. *See Carroll*, 138 N.H. at 696-97 (defendant enjoyed freedom of movement around the police station during interview). Moreover, when the police were through questioning him, the defendant was told to "hang out" and was then formally arrested, without ever being allowed to move about, let alone leave the station. *See Carroll*, 138 N.H. at 696 (defendant was permitted to leave police station on two occasions after interviews in which he made statements implicating himself in murder); *see also Carpentier*, 132 N.H. at 127 (after three-hour interview, defendant

asked to leave police station, police drove him back to work, and defendant was not arrested until ten days later).

In arguing that the trial court erred in concluding that the defendant was in custody, the State emphasizes the fact that the defendant was told he was free to go. A person who is clearly advised that he is free to leave is ordinarily not in custody. *See, e.g., Locke*, 149 N.H. at 7 ("Given the repeated advice that he was free to leave, we conclude that a reasonable person in the defendant's position would not have believed that he was restrained to the degree associated with formal arrest."). Sergeant Jackson testified that once inside the interview room, he informed the defendant that he was not under arrest and was free to leave at any time. However, as the trial court expressly found, there was no evidence that the defendant understood. *See id.* at 4 (defendant informed he was not in custody and was free to leave and defendant stated that he understood). Moreover, there was no evidence that even if he did understand, a reasonable person actually would have felt free to do so given the above-described circumstances.

There are times when actions speak louder than words. Ultimately, "police conduct should be judged in terms of what was done rather than what the officer may have called it at the time." *Turmel*, 150 N.H. at 387 (Brock, C.J., dissenting) (quotation omitted). Here, as noted above and as found by the trial court, many indicia of custody were present, and the accusatory nature of the interview is undeniable. By the time the police confronted the defendant in the closed-door interview room with both his daughter's accusations and their own certainty that the accusations were true, a reasonable person in the defendant's position would have found his freedom curtailed to the extent that *Miranda* warnings were required. Thus, we think it implausible "that the defendant could have risen from his seat and freely exited the interview room in the middle of an escalating period of interrogation and gone along on his merry way, especially when the detectives had developed a theory which directly implicated him, and it was their intention to question him further at that point about his involvement." *State v. Dedrick*, 132 N.H. 218, 223 (1989) (quotation omitted), *cert. denied*, 494 U.S. 1007 (1990).

■ In light of our discussion of the totality of the circumstances, we agree with the trial court that even if Sergeant Jackson informed the defendant that it was "voluntary" as to whether he went to the police station and once inside the interview room told the defendant he could leave at any time, "it would be naive of the court to suggest that a reasonable person in the position of the defendant would have believed that he could have simply declined to accompany the detectives to the

police station, and once there to have believed he would be allowed to get up and leave." Accordingly, we affirm the trial court's ruling that the defendant was in custody for purposes of Part I, Article 15 of the New Hampshire Constitution and that his statements must therefore be suppressed. Because the defendant prevails under the State Constitution, we need not address his claim under the Federal Constitution.

*II. Double Jeopardy*

The defendant was indicted for five counts of aggravated felonious sexual assault. Three of the indictments alleged pattern sexual assaults under RSA 632-A:2, III (2007). Each pattern indictment alleged that the defendant digitally penetrated H.J. on more than one occasion over a period of two months or more and within a period of five years. Indictment No. 05-1067 alleged that assaults occurred between January 2002 and November 2003 in Nashua. Indictment No. 05-877 alleged that assaults occurred between December 2003 and August 2004 at Wellesley Street in Milford. Indictment No. 05-879 alleged that assaults occurred between September 2004 and March 2005 at King Street in Milford.

The defendant filed a motion to dismiss, arguing that the indictments violated his double jeopardy rights under the Fifth and Fourteenth Amendments to the United States Constitution. The trial court agreed, and dismissed indictments Nos. 05-877 and 05-879. Using our decision in *State v. Richard*, 147 N.H. 340 (2001), as a point of departure, the trial court held that the pattern indictments subjected the defendant to multiple punishments for the same offense because each indictment charged the same variant of sexual assault, and the cumulative time frame of all the indictments was less than five years. On appeal, the State argues that the pattern sexual assault statute allows the charging of multiple patterns involving the same type of sexual assault during a single five-year period, when the indictments each rely upon a different set of acts and each set of acts is alleged to have occurred during a different time frame and at a different location. Therefore, argues the State, the charging of multiple patterns in this case does not run afoul of double jeopardy. We agree, and reverse the trial court's dismissal of the indictments.

The Double Jeopardy Clause of the Federal Constitution serves three primary purposes. "First, it protects against a second prosecution for the same offense after an acquittal. Second, it protects against a second prosecution for the same offense after a conviction. Third, it protects against multiple punishments for the same offense." *State v. Bailey*, 127 N.H. 811, 814 (1986) (quotation omitted). This case involves an alleged violation of the third category of protection.

■ In determining whether a defendant is subject to multiple punishments for the same offense, we must determine the unit of prosecution intended by the legislature. *Richard*, 147 N.H. at 342. When a statutory provision is ambiguous, the rule of lenity demands that all doubt be resolved against turning a single transaction into multiple offenses and thereby expanding the statutory penalty. *State v. Cobb*, 143 N.H. 638, 647 (1995). However, the rule of lenity "is applicable only where statutory ambiguity has been found. Lenity thus serves only as an aid for resolving an ambiguity; it is not to be used to beget one." *Bailey*, 127 N.H. at 814 (quotation and citation omitted). We review the plain language of the pattern statute to discern the legislature's intent.

The pattern statute in pertinent part provides: "A person is guilty of aggravated felonious sexual assault when such person engages in a pattern of sexual assault against another person, not the actor's legal spouse, who is less than 16 years of age." RSA 632-A:2, III. "Pattern of sexual assault" is defined as "committing more than one act under RSA 632-A:2 or RSA 632-A:3, or both, upon the same victim over a period of 2 months or more and within a period of 5 years." RSA 632-A:1, I-c (2007). RSA 632-A:2 (2007) and RSA 632-A:3 (2007) provide different statutory variants for aggravated felonious sexual assault and felonious sexual assault.

The defendant argues that the pattern sexual assault statute is intended to define as a single pattern all sexual assaults of the same variant that occur within a five-year period, and that the pattern indictments subject him to multiple punishments for the same offense because they all allege the same variant of sexual assault against the same complainant within the same five-year period. The pattern statute on its face contains no such limit.

Moreover, to read such a limit into the statute would undermine its very purpose. The purpose of the pattern statute is to address the "legitimate concern that many young victims, who have been subject to repeated, numerous incidents of sexual assault over a period of time by the same assailant, are unable to identify discrete acts of molestation. These young victims may have no practical way of recollecting, reconstructing, distinguishing or identifying by specific incidents or dates all or even any of the acts of sexual assault." *State v. Fortier*, 146 N.H. 784, 790-91 (2001) (quotation and citations omitted).

In *State v. Richard*, the defendant made a claim similar to the one being made here, arguing that the pattern statute was intended to define as a single pattern any and all variants of sexual assault under RSA 632-A:2 and :3 committed against a single victim during a common time frame, regardless of the number of underlying acts. *Richard*, 147 N.H. at 342-43. We disagreed, noting:

The legislature broadly defined the proscribed pattern to include the commission of two or more acts under the aggravated felonious sexual assault statute, RSA 632-A:2, *or* two or more acts under the felonious sexual assault statute, RSA 632-A:3, *or* a combination thereof. Reading "pattern of sexual assault" as encompassing *all* statutory variants of sexual assault committed against a victim during a common time frame would lead to an absurd result. Such an interpretation would effectively limit the criminal exposure of a perpetrator to a single conviction when a victim is unable to recall discrete assaults due, in part, to their frequency, while defendants whose victims have discrete recall would remain accountable for multiple convictions under the single-act sexual assault provisions, RSA 632-A:2, I-II; RSA 632-A:3, I-IV. To interpret the pattern statute as the defendant suggests would allow a perpetrator to benefit from the fact that his repetitive assaults may have blurred a victim's memory. Such a result is illogical.

*Id.* at 343 (citations omitted).

■ For similar reasons, reading "pattern of sexual assault" to encompass every assault of a given variant that occurs within five years would lead to an absurd result. *State v. Warren*, 147 N.H. 567, 568 (2002) (presumption that legislature would not enact statute that would lead to absurd result). The more plausible reading of the statute allows the State to charge more than one pattern of a given sexual assault variant within a five-year time frame, each as an individual unit of prosecution, when the evidence of discrete patterns so warrants. Because the indictments in this case charge three discrete patterns of sexual assault, as permitted by the statute, and because the prosecution at trial would have to prove that the acts occurred within each of the alleged, discrete periods of time, *State v. Hannon*, 151 N.H. 708, 713-14 (2005), the defendant is not subject to multiple punishments for the same offense and his federal double jeopardy right is not infringed.

We were careful to note in *Richard* that "[w]hen seeking convictions on multiple pattern indictments that charge numerous assaults within a common time frame inflicted on a single victim . . . the pattern indictments cannot rely on the same underlying act or acts to comprise the charged pattern." *Richard*, 147 N.H. at 343. The same requirement applies here. The requirement is met, however, because the pattern indictments allege three separate sets of acts during three discrete time periods at three different locations.

As in *Richard*, we note that when pursuing multiple pattern indictments involving a particular victim, the State should be mindful of its obligation to exercise meaningful prosecutorial discretion. *Id.* at 344. Furthermore, a defendant's double jeopardy rights might preclude multiple pattern charges in a particular case depending upon the nature of the evidence. As in *Richard*, these issues are left for another day. *Id.*

> *Affirmed in part; reversed in part; and remanded.*

BRODERICK, C.J., and GALWAY and HICKS, JJ., concurred; DALIANIS, J., concurred in part and dissented in part.

DALIANIS, J., concurring in part and dissenting in part. Because I agree with the majority's analysis in Part I of its opinion, I concur in that part of the opinion. I write separately because I would affirm the trial court's dismissal of the indictments on double jeopardy grounds and, thus, dissent from Part II of the opinion.

The Double Jeopardy Clause of the Federal Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. It "protects a defendant's rights in three ways: First, it protects against a second prosecution for the same offense after an acquittal. Second, it protects against a second prosecution for the same offense after a conviction. Third, it protects against multiple punishments for the same offense." *State v. Bailey*, 127 N.H. 811, 814 (1986) (quotation omitted); *see United States v. Ursery*, 518 U.S. 267, 273 (1996). The defendant asserts a violation of the third category of protection.

To determine whether the defendant was subject to multiple punishments for the same offense, we must determine the proper unit of prosecution intended by the legislature. *See State v. Richard*, 147 N.H. 340, 342 (2001). "We give the language of a statute a commonsensical meaning," and apply the rule of lenity only if we find the statutory language to be ambiguous. *State v. Cobb*, 143 N.H. 638, 647 (1999) (quotation omitted).

The Criminal Code defines a "pattern of sexual assault" to mean "committing more than one act under RSA 632-A:2 or RSA 632-A:3, or both, upon the same victim over a period of 2 months or more and within a period of 5 years." RSA 632-A:1, I-c (2007). In *Richard*, we determined that the legislature intended the unit of prosecution in a pattern offense to be the pattern itself. *See Richard*, 147 N.H. at 342-44. This is consistent with our decision in *State v. Fortier*, 146 N.H. 784, 791 (2001), in which we explained that the legislature intended the pattern statute to "criminalize a

continuing course of sexual assaults, not isolated instances." Thus, in *Fortier*, we ruled that the "essential culpable act" in a pattern offense was "the pattern itself, that is, the occurrence of more than one sexual assault over a period of time, and not the specific assaults comprising the pattern." *Fortier*, 146 N.H. at 791. To secure a conviction under the pattern statute, therefore, "the State must prove to a unanimous jury ... (1) that the defendant engaged in more than one prohibited act under RSA 632-A:2 or 632-A:3; and (2) that the acts occurred over a period of two months or more and within a period of five years." *State v. Hannon*, 151 N.H. 708, 713-14 (2005) (quotation omitted).

I believe that the indictments at issue violate the Federal Double Jeopardy Clause because they charge a single offense—a single pattern— in more than one count. *See United States v. Brandon*, 17 F.3d 409, 422 (1st Cir.), *cert. denied*, 513 U.S. 820 (1994). Each indictment alleges the *same* prohibited act against the *same* victim during the *same* five-year period. Here, there are not "multiple patterns of sexual assault involving a single victim ... during a common time frame," but only one pattern. *Richard*, 147 N.H. at 343. As we explained in *Richard*, "When seeking convictions on multiple pattern indictments that charge numerous assaults within a common time frame inflicted on a single victim, ... the pattern indictments cannot rely on the same underlying act or acts to comprise the charged pattern.... [T]wo indictments charging a common time period cannot charge the same type of sexual assault." *Id.*

The majority contends that the patterns alleged are different because they comprise "three separate sets of acts during three discrete time periods at three different locations." I disagree. While in *Richard*, the indictments "each charged a particular variant of sexual assault different from the type charged in the other patterns," here, each indictment charged the same variant of sexual assault. *Id.* Moreover, different patterns were not alleged merely because the same five-year period was divided into separate increments and the assaults were alleged to have occurred at different addresses. "The Double Jeopardy Clause is not such a fragile guarantee that prosecutors can avoid its limitations by the simple expedient of dividing a single crime into a series of temporal or spatial units." *Brown v. Ohio*, 432 U.S. 161, 169 (1977); *cf. State v. Sweeney*, 151 N.H. 666, 678 (2005) (time and location are not essential elements of aggravated felonious sexual assault or felonious sexual assault). The statutorily proscribed conduct is a continuous offense, a pattern of conduct, which a prosecutor cannot individuate temporally or geographically. *See Brown*, 432 U.S. at 169.

For all of the above reasons, therefore, I would affirm the trial court's dismissal of the indictments.