New London District Court
No. 2002-589

## THE STATE OF NEW HAMPSHIRE

v.

## JOSEPH J. TURMEL

Argued: October 30, 2003
Opinion Issued: December 29, 2003

*Peter W. Heed*, attorney general (*Stephen D. Fuller*, senior assistant attorney general, on the brief and orally), for the State.

*Keefe and Browne, P.A.*, of Manchester (*F. Michael Keefe* on the brief and orally), for the defendant.

DALIANIS, J. The defendant, Joseph J. Turmel, appeals his conviction in the New London District Court (*McSwiney*, J.) of one count of possession of marijuana, a class B misdemeanor, *see* RSA 318-B:2, I (1995); RSA 625:9, VII (Supp. 2002). We affirm.

On October 11, 2001, the defendant, with one passenger, was driving northbound on Interstate 89. At approximately 5:00 p.m., Trooper First Class James Mayers approached the defendant's car in an unmarked State Police pickup truck. Mayers had been employed by the New Hampshire State Police for approximately fifteen years and had been a detective involved with undercover narcotics investigations for the previous five and a half years. Mayers, traveling approximately 70 to 75 miles per hour, observed the defendant ahead of him, traveling at approximately 65 to 70 miles per hour. As Mayers passed the defendant's car he observed the defendant, a male in his early to mid-twenties, holding what Mayers believed to be a "blunt," a cigar with part of its tobacco replaced by marijuana, between his thumb and index finger, and "cupping" it inside his hand. Mayers then observed the defendant place the cigar to his mouth, inhale, and pass the cigar to his passenger, who also placed the cigar to his mouth and inhaled.

Mayers, a certified drug recognition expert and the State of New Hampshire Coordinator of the Drug Enforcement Agency (DEA) Marijuana Eradication Program, thought that the appearance of the cigar, the way the defendant held the cigar, and the sharing of the cigar with his passenger indicated marijuana use. Mayers radioed for a marked police cruiser to engage the defendant. Mayers pulled ahead of the vehicle and monitored it for approximately three miles until Sgt. Scott Sweet caught up to pursue. Sweet then followed the defendant for approximately six miles at which point two other marked police cruisers joined the pursuit. Neither Mayers nor Sweet saw the defendant drive erratically or violate any traffic laws. The three police cruisers and Mayers' unmarked truck then pulled the defendant over to investigate the officers' suspicion of possession and use of marijuana.

Sweet approached the defendant and asked him to step out of the car. Sweet and Mayers then took the defendant to the back of the car. Two other officers took the passenger to the front of the car. As the defendant exited, Mayers smelled the odor of marijuana emanating from the interior of the car and the defendant. Mayers introduced himself to the defendant as an officer with the Narcotics Investigation Unit of the State Police, and explained that he had observed the defendant smoking marijuana in the car. Mayers told the defendant that he wanted him to cooperate and asked him if he had been smoking marijuana. The defendant answered affirmatively. Mayers told him that he was not under arrest and asked him whether there were any weapons or drugs in the car. The defendant said there were none, at which time Mayers requested consent to search the vehicle. Mayers told the defendant that if no weapons or drugs were found in the car, the defendant would "probably" be free to leave. Mayers told the defendant that he did not have to consent to the search, but if the defendant did not consent, he would pursue "other avenues" to search the car.

Mayers' initial search did not produce any illegal contraband. Following the discovery of a large amount of cash in the trunk, however, a trooper with a drug-sniffing dog arrived at the scene, and the butt of a marijuana cigarette was eventually found in the car's ashtray.

Neither Sweet nor Mayers read the defendant *Miranda* warnings before the questioning of the defendant and his subsequent consent to search the car.

Prior to trial, the defendant moved to suppress all evidence and statements obtained as a result of the investigatory stop on October 11, 2001. The trial court denied the motion.

We first address the defendant's claims under the State Constitution, *State v. Ball*, 124 N.H. 226, 231 (1983), and cite federal opinions for guidance only. *Id.* at 232-33.

*I. Reasonable Suspicion*

■ The defendant argues that Mayers lacked reasonable suspicion for his investigatory stop. In order for a police officer to undertake an investigatory stop, the officer must have a reasonable suspicion, based upon specific, articulable facts taken together with rational inferences from those facts, that the particular person stopped has been, is, or is about to be, engaged in criminal activity. *State v. Hight*, 146 N.H. 746, 748 (2001); *see also Terry v. Ohio*, 392 U.S. 1, 20-21 (1968). The officer's suspicion must have a particularized and objective basis in order to warrant that intrusion into protected privacy rights. *State v. Roach*, 141

N.H. 64, 66 (1996). We have applied the *Terry* standard to motor vehicle stops. *Hight,* 146 N.H. at 748; *see State v. Pellicci,* 133 N.H. 523, 528-29 (1990).

The defendant contends that Mayers did not articulate any feature of the cigar that would serve to distinguish it from an ordinary cigar. The mere observation of the defendant smoking a cigar, alone, may not lead one to reasonably suspect that the defendant was smoking marijuana. *See State v. Varnell,* 410 So. 2d 1108, 1110 (La. 1982). Indeed, even the observation of the defendant holding the cigar between his thumb and index finger in a "cupped" fashion, alone, might not be enough to arouse reasonable suspicions of marijuana use. *See State v. Davis,* 359 So. 2d 986, 989 (La. 1978).

We do not, however, consider each fact in isolation. *See State v. Wallace,* 146 N.H. 146, 149 (2001). To determine the sufficiency of the officer's suspicion, we must consider the facts he articulated in light of all the surrounding circumstances, keeping in mind that a trained officer may make inferences and draw conclusions from conduct which may seem unremarkable to an untrained observer. *Id.*; *Pellicci,* 133 N.H at 530. In the present case, Mayers was a certified drug recognition expert and the New Hampshire Coordinator of the DEA Marijuana Eradication Program. Further, Mayers articulated that his reasonable suspicion arose, in particular, based upon his training and experience in the detection of marijuana, leading him to conclude that marijuana was being used from his observation of the manner in which the defendant held the cigar coupled with his sharing of the cigar with his passenger.

The defendant argues that there are innocent explanations for the way he held the cigar and shared it with his passenger. He contends that people hold cigars in many different ways and that sharing cigars is not uncommon, especially with more expensive cigars. That observed activity could be consistent with both guilty and innocent behavior, however, does not mean that an officer must rule out innocent explanations before proceeding. *State v. Galgay,* 145 N.H. 100, 103 (2000).

While the manner in which the defendant held the cigar and the sharing of the cigar might have been innocuous, it was also reasonable for a trained officer like Mayers to suspect that the defendant was engaging in marijuana use. *See People v. Jacobson,* 596 N.E.2d 893, 895 (Ill. Ct. App. 1992). We hold that, in light of the surrounding circumstances, Mayers, based upon his training and experience, articulated sufficient facts of a

particularized and objective nature from which he could have formed the reasonable suspicion that the defendant was using marijuana.

■ The defendant next argues that the reasonable suspicion "evaporated" during the approximately ten minutes that Mayers tracked the defendant's car, because he observed no other indicia of criminal activity. In *Galgay*, 145 N.H. at 102-03, an informant observed a man driving his car erratically and reported it to the police. Almost an hour later, after the driver had entered a restaurant and then returned to his car, a police officer pulled him over after observing the man enter his car and drive it out of the parking lot. *Id.* at 103. We held that the passage of time of almost an hour and the "defendant's ability for a brief span of time to competently enter his car and drive it out of [a] parking lot . . . [did] not negate the officer's reasonable suspicion" necessary to perform an investigatory stop. *Id.* at 104. In the present case, the passage of approximately ten minutes and Mayers' observation of the defendant driving in a competent manner does not diminish the reasonable suspicion that existed for the officers to perform an investigatory stop, because neither the elapsed time nor the operation of the car negate Mayers' observations concerning the cigar.

The Federal Constitution offers the defendant no greater protection than does the State Constitution under these circumstances. *See Hight*, 146 N.H. at 748; *Terry*, 392 U.S. at 20-21. Accordingly, we reach the same result under the Federal Constitution as we do under the State Constitution.

## II. Custody

We next address the defendant's argument that he was subjected to custodial interrogation without being advised of his *Miranda* rights, *see Miranda v. Arizona*, 384 U.S. 436 (1966), in violation of his State and Federal Constitutional rights against self-incrimination. *See* N.H. CONST. pt. I, art. 15; U.S. CONST. amend. V.

■ The police are obligated to issue *Miranda* warnings when conducting a custodial interrogation. *See State v. Hammond*, 144 N.H. 401, 403 (1999). Although we will not overturn the factual findings of the trial court unless they are contrary to the manifest weight of the evidence, we review the ultimate determination of custody *de novo*. *State v. Ford*, 144 N.H. 57, 63 (1999).

■ ■ Custody entitling a defendant to *Miranda* protections requires formal arrest or restraint on freedom of movement of the degree

associated with formal arrest. *Id.* When deciding whether there is custody when there has been no formal arrest, we must determine the degree to which the suspect's freedom of movement was curtailed by considering how a reasonable person in the suspect's position would have understood the situation. *State v. Graca*, 142 N.H. 670, 675 (1998). A defendant is not in custody for *Miranda* purposes, however, merely because his freedom of movement has been curtailed so that he has been "seized" in a Fourth Amendment sense. *State v. Johnson*, 140 N.H. 573, 578 (1995); *see also Berkemer v. McCarty*, 468 U.S. 420, 439 (1984).

A person is considered "seized" if, in view of all the circumstances surrounding an investigatory stop, a reasonable person would have believed that he was not free to leave. *Reid*, 135 N.H. at 380. During an investigatory stop, a reasonable person may not feel free to leave, because, in fact, he is not free to leave. *See State v. Hamel*, 123 N.H. 670, 676 (1983). The police may temporarily detain a suspect for investigatory purposes. *State v Reid*, 135 N.H. 376, 380 (1992); *see also Terry*, 392 U.S. at 16. Such temporary custody does not, however, constitute custody for *Miranda* purposes and, therefore, *Miranda* warnings are not triggered. *See Berkemer*, 468 U.S. at 439; *State v. Grey*, 148 N.H. 666, 670 (2002); *Hamel*, 123 N.H. at 675-76.

In this case, the defendant was the subject of an investigatory stop, during which he was lawfully detained. *See Terry*, 392 U.S. at 20-29; *State v. Szczerbiak*, 148 N.H. 352, 355 (2002); *Pellicci*, 133 N.H. at 528-29. During a legal investigatory stop, an officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. *Szczerbiak*, 148 N.H. at 355. The scope of the stop, however, must be carefully tailored to its underlying justification—to confirm or to dispel the officer's particular suspicion. *Id.* The stop must last no longer than is necessary to effectuate its purpose. *Id.*

An investigatory stop may "metamorphose into an overly prolonged or intrusive detention (and, thus, become unlawful)." *United States v. Lee*, 317 F.3d 26, 31 (1st Cir. 2003). Whether the detention is a lawful investigatory stop or goes beyond the limits of such a stop depends upon the facts and circumstances of a particular case. *See Reid*, 135 N.H. at 381. If the detention was within the scope of an investigatory stop, the defendant will not be deemed in custody for purposes of *Miranda*. *See Terry*, 392 U.S. at 20-29.

Upon first consideration, this case may appear to be a "borderline case, *e.g.*, one in which the detention at issue has one or two arrest-like features but otherwise is arguably consistent with a *Terry* stop." *United States v. Acosta-Colon*, 157 F.3d 9, 15 (1st Cir. 1998). Upon further consideration, however, it becomes apparent that the point at which the stop might have "metamorphosed" into the functional equivalent of arrest for *Miranda* purposes occurred, if at all, after both the defendant's incriminating statement and his consent to search the car.

Here, Mayers pulled the defendant over with the reasonable suspicion that he was smoking and possessing marijuana. During the investigatory stop, Mayers could lawfully detain the defendant for a limited period of time and obtain information to confirm or dispel whether he was, in fact, smoking marijuana. Sweet asked the defendant to step out of the car, a permissible request during an investigative stop. *See Hamel*, 123 N.H. at 676. Mayers smelled marijuana emanating from the defendant and the car. He immediately asked the defendant whether he had been smoking marijuana. This question is also within the scope of a valid investigatory stop. *Mitchell v. United States*, 746 A.2d 877, 885-89 (D.C. 2000) (defendant was not "in custody" for *Miranda* purposes during traffic stop when an officer removed him from his car and asked him questions about marijuana possession). Once the defendant admitted the use, Mayers requested consent to search the car, informing the defendant that he could refuse. Mayers' request for consent to search was also permissible during the investigatory stop for possession of marijuana.

Further, the stop was reasonable in its length. The United States Supreme Court declined to adopt a bright line rule that a twenty-minute detention is too long to be justified under *Terry*, explaining that several factors are relevant to assess "whether a detention is too long in duration to be justified as an investigative stop." *United States v. Sharpe*, 470 U.S. 675, 686 (1985); *Reid*, 135 N.H. at 381-82. These factors include the law enforcement purposes that are served by the detention, the diligence with which the investigation is pursued by the police, and the scope, intrusiveness and duration of the detention. *Reid*, 135 N.H. at 382. Here, immediately after the officers stopped the defendant's car, the defendant was told to step out of the car and taken to the rear of the car. Without physically restraining the defendant, one officer identified himself and asked the defendant if he had been smoking marijuana. The officers' purpose was to confirm or dispel the suspicion that the defendant possessed marijuana. Upon stopping the defendant's car, the officers were diligent in addressing the purpose of the stop, asking only questions that

were directly related to their suspicion. Up until this point, the duration of the stop was under ten minutes.

Only two officers spoke to the defendant and were in his immediate vicinity. Mayers told the defendant that he was not under arrest. Additionally, the officers did not frisk the defendant, handcuff him or display their weapons. At this point, the defendant could reasonably conclude that he was not free to leave, but not that he was under the functional equivalent of arrest. The fact that there were a total of four police officers and three patrol cruisers present does not in and of itself negate the fact that this was a valid investigatory stop. *See Lee*, 317 F.3d at 31 (stating that the presence of five officers does not, without more facts, "lead inexorably to a conclusion that" the stop went beyond the scope of a *Terry* stop); *United States v. Quinn*, 815 F.2d 153, 156-57 (1st Cir. 1987) (holding that the presence of several police officers and the blocking of defendant's car did not convert an investigative stop into arrest).

 In this case, where the defendant was not detained for an unduly long period of time and was asked a limited number of questions that were consistent with the purpose of the stop, we hold that at the time that he made the challenged statements—immediately after he got out of his car—he was being held within the confines of a valid investigatory stop. *See Terry*, 392 U.S. at 20-29; *Szczerbiak*, 148 N.H. at 355. We agree with the trial court's finding that he was not in custody when questioned by the officers, and the statements made by the defendant were properly admitted.

The defendant did not argue that his statements or consent to search were involuntary or coerced. This issue was raised in the defendant's notice of appeal, but it does not appear in his brief; thus, we treat the issue as waived. *Graca*, 142 N.H. at 676.

The Federal Constitution offers the defendant no greater protection than does the State Constitution with regard to the defendant's rights under *Miranda*. *See Ford*, 144 N.H. at 63; *Terry*, 392 U.S. at 20-29. Accordingly, we reach the same result under the Federal Constitution as we do under the State Constitution.

*Affirmed.*

BRODERICK and DUGGAN, JJ., concurred; BROCK, C.J., and NADEAU, J., dissented; in addition, NADEAU, J., dissented separately.

BROCK, C.J., and NADEAU, J., dissenting. Because we disagree with the conclusion that the defendant was not in custody and was, therefore, not

entitled to *Miranda* warnings, *see Miranda v. Arizona*, 384 U.S. 436, 444 (1966), we respectfully dissent.

Although the United States Supreme Court has declined to extend *Miranda* warnings to investigatory stops as well as ordinary traffic stops, *see Berkemer v. McCarty*, 468 U.S. 420, 440 (1984); *see also State v. Graca*, 142 N.H. 670, 676 (1998), the instant case does not fit neatly within the ambit of either of these temporary seizures. Rather, it is more properly categorized as a "borderline case"—"one in which the detention at issue has one or two arrest-like features but otherwise is arguably consistent with [an investigatory] stop." *United States v. Acosta-Colon*, 157 F.3d 9, 15 (1st Cir. 1998). Thus, "the analysis must revert to an examination of whether the particular arrest-like measures implemented can nevertheless be reconciled with the limited nature of a *Terry*-type stop." *Id.* Based upon a fact-specific inquiry, *see id.*, we do not believe that they can. *See State v. Locke*, 149 N.H. 1, 6 (2002) (holding that custody is reviewed *de novo*).

The defendant's detention differed dramatically from the typical non-custodial traffic stop envisioned in *Berkemer*. *Berkemer*, 468 U.S. at 438-39. In that case, the Court held that "[t]he fact that the detained-motorist typically is confronted by only one or at most two policemen further mutes his sense of vulnerability. . . . [T]he atmosphere surrounding an ordinary traffic stop is substantially less 'police dominated' than that surrounding the kinds of interrogation at issue in *Miranda* itself." *Id.* In the instant case, however, the atmosphere surrounding the defendant's stop was undoubtedly police dominated. The defendant was stopped by three uniformed State troopers driving marked police cruisers, as well as one plain-clothed officer driving an unmarked police truck. *See Locke*, 149 N.H. at 6 (in determining custody, the court may consider, among other things, number of police officers present); *see also State v. Hammond*, 144 N.H. 401, 404 (1999) (the fact that officers were not wearing their uniforms, nor were their weapons visible, contributed to a finding of no custody). The police-dominated environment was reinforced by the fact that the police cars physically surrounded the defendant's vehicle; two cars pulled ahead of his vehicle, while the remaining two pulled in behind it. *See People v. Taylor*, 41 P.3d 681, 693 (Colo. 2002) (the fact that defendant "was surrounded by armed uniformed police officers and their patrol cars and was essentially encircled . . . while the interrogation occurred," rendered him "completely at the mercy of the police," and, therefore, in custody (quotations omitted)). Although this atmosphere, "without more, does not lead inexorably to a conclusion that a de facto arrest occurred," *United States v. Lee*, 317 F.3d 26, 31 (1st Cir. 2003), it signals, from the

outset of the stop, that the defendant's detention was escalating toward arrest.

Moreover, the character of the interview in this case was quite different from that permitted during investigatory stops. *See Locke*, 149 N.H. at 6 (in determining custody, the court may consider, among other things, interview's character). Although "[d]uring a detention, an officer may ask the detainee a moderate number of questions ... to try to obtain information confirming or dispelling the officer's suspicions," *State v. Szczerbiak*, 148 N.H. 352, 355 (2002), the interview in this case, from its inception, assumed an intimidating tone and was more indicative of custodial interrogation, which is yet another arrest-like feature. *See, e.g., State v. Dorval*, 144 N.H. 455, 457 (1999) (the fact that the interview was conducted in an amicable way contributed to a finding of no custody). Once the defendant's vehicle was stopped, the police immediately employed a divide-and-conquer interrogation strategy in which they separated the defendant and the passenger, taking one to the front of the car while leading the other to the rear. Trooper Mayers then introduced himself as a police officer and told the defendant that he had observed him smoking marijuana. During the hearing on the suppression motion, Trooper Mayers testified that he told the defendant: "I was interested in him cooperating, because I know what I observed."

While speaking to the defendant, Trooper Mayers also tried to be "clear and concise and right to the point." He testified: "I wasn't asking him, I was telling him what I observed, and I know what I observed, and that if he was to cooperate, it would be much – much faster." In response to a question by Trooper Mayers, the defendant then admitted using marijuana.

This intimidating and coercive exchange comports with the type of tactics against which *Miranda* warnings were initially designed to protect—"tactics ... designed to put the subject in a psychological state where his story is but an elaboration of what the police purport to know already—that he is guilty." *Miranda*, 384 U.S. at 450. Based upon these circumstances, we would hold that the defendant was in custody for purposes of *Miranda*.

Although the police told the defendant that he was not under arrest, that information was explained to the defendant *after* he admitted smoking marijuana and, therefore, was conveyed too late to rectify the self-incrimination that occurred during the defendant's interrogation. Moreover, "police conduct should be judged in terms of what was done rather than what the officer involved may have called it at the time." *State v. Noel*, 137 N.H. 384, 388 (1993). Taken together, the police-dominated

atmosphere and the intimidating questioning of the defendant created precisely the type of inherently coercive environment feared in *Miranda*. *See Miranda*, 384 U.S. 457. There can be little doubt that this environment would lead a reasonable person to believe that he is being subjected to restraints on his freedom to such a degree that he is under arrest, *see Locke*, 149 N.H. at 6, and, as a result, we believe the defendant was in custody.

NADEAU, J., dissenting. Although I join the Chief Justice in his dissent, I write separately because I have serious reservations about the validity of the initial stop, as well.

The officer stopped this defendant because he smoked a small cigar, cupped it in his hand, and passed it once to a passenger who also inhaled from it. I question whether these facts are sufficient to justify stopping a citizen driving lawfully upon a public way. *See State v. Hight*, 146 N.H. 746, 748 (2001).

The officer suspected that the defendant was smoking marijuana because of the size of the cigar and because the defendant cupped it in his hand and shared it with his passenger. He made these observations while passing the defendant's car at approximately 65 to 70 miles per hour. Before he could make any other observations, he had passed the defendant's car. Notably, the officer did not see the defendant and his passenger pass the small cigar back and forth. Nor did he observe how the defendant or his passenger inhaled and exhaled smoke.

This case is distinguishable from others in which courts have held the facts sufficient to justify an investigatory stop. For instance, in *People v. Jacobson*, 596 N.E.2d 893, 895 (Ill. App. Ct. 1992), upon which the majority relies, the officer observed the defendant with a hand-rolled cigarette that he and his passenger passed back and forth four times. He observed that the way in which the two men handled and inhaled the cigarette was consistent with smoking a marijuana cigarette. *Id.*

Similarly, in *Provo City Corp. v. Spotts*, 861 P.2d 437, 438 (Utah Ct. App. 1993), before stopping the defendant, the officer saw him smoke a hand-rolled cigarette that was shaped like a joint. She saw the joint disintegrate rapidly as it burned and observed that, although it was a warm day, the defendant had his car windows rolled up. *Id.* Further, she saw the defendant inhale deeply before exhaling, which, based upon her experience, she believed to be consistent with taking hits off of a marijuana joint. *Id.* at 440. The officer made her observations while the defendant's

truck was stopped approximately ten feet from the officer's vehicle. *Id.* at 438.

It seems doubtful to me that cupping a small cigar inside one's hand and passing it once to someone else are characteristics "so restricted to marijuana smokers as to arouse reasonable suspicion of unlawful conduct." *State v. Varnell*, 410 So. 2d 1108, 1110 (La. 1982).