LYNN, J.,
dissenting. Contrary to the majority, I do not regard this as “a close case.” In my view, based on the facts and the law, the defendant clearly was not in custody at any time until the officers placed him under arrest at the end of the interview. As the discussion below demonstrates, the majority does not cite, nor has my research revealed, any case in which an appellate court has overturned a trial court finding that an interrogation was not custodial in factual circumstances that are in any way reasonably analogous to those presented here.
Under well-settled law, although we review de novo a trial court’s ultimate legal conclusion as to whether a defendant was in custody when interrogated, we are required to accept the court’s underlying factual findings unless they are unsupported by the record or clearly erroneous. See, e.g., State v. Jennings, 155 N.H. 768, 772-73 (2007); State v. Ford, 144 N.H. 57, 62-63 (1999). This deferential standard with respect to underlying fact-finding applies not only to the trial court’s resolution of credibility issues, but also to inferences drawn from the circumstantial evidence. As the First Circuit explained in United States v. Hughes, 640 F.3d 428, 434 (1st Cir. 2011), “when the [trial court] chooses to draw a reasonable (though not inevitable) inference from a particular combination of facts, that inference is entitled to respect.” Id. (quotation omitted). Here the majority departs from this rule by subtly recasting the underlying facts in a manner that deviates from the trial court’s findings or from inferences that are supported by the record and that we must assume the trial court drew because they support the court’s decision. See In the Matter of Aube & Aube, 158 N.H. 459, 466 (2009) (“We must assume that the trial court made subsidiary findings necessary to support its general ruling.” (quotation *688 omitted)). In short, in the guise of conducting de novo review of the trial court’s ultimate legal conclusion that the defendant was not in custody, the majority effectively substitutes its judgment for that of the trial court as to the underlying facts. Because, under the deferential standard of review applicable to the trial court’s actual fact-finding, the majority’s legal conclusion that the defendant was in custody when interrogated deviates from our prior precedents and is unsupported by any authority, I respectfully dissent.
I
Based upon the evidence presented at the pretrial suppression hearing, the trial court found the pertinent facts to be as follows. In October 2010, K.L. reported to the Newmarket Police Department that she had been sexually abused by the defendant approximately nine to fourteen years earlier. At the time of the alleged abuse, the defendant was dating the woman who ran the Newmarket daycare center where the abuse occurred. At the time the abuse was reported, the defendant resided in Errol at the Bullmoose campground and restaurant, which he also owned and operated.
Lieutenant Kyle True and Sergeant Tara Laurent began investigating the allegations against the defendant and, based upon their investigation, obtained a warrant for his arrest. On October 22, 2010, True and Laurent met New Hampshire State Trooper Relia in Colebrook and followed him to the Bullmoose to interview the defendant. Relia drove his fully-marked State Police cruiser, while True and Laurent drove in an unmarked police vehicle. • Upon arriving at the Bullmoose, the officers drove up a long driveway that opened into a large, one-acre clearing where the parking lot and restaurant were located. The clearing was surrounded by trees. The officers parked their cars in the lot, and Relia, dressed in his full State Police uniform, which included his visible sidearm, entered the restaurant and spoke to the defendant’s girlfriend, who directed Relia to another building where the defendant was working. The defendant and Relia walked to the parking lot, where True and Laurent were waiting. True and Laurent each wore a dark jacket with the Newmarket Police badge and their names embroidered on the front, but were otherwise not in uniform and bore no other visible police insignias. Both officers were armed, but their weapons were covered by their jackets and were not visible. Relia introduced the defendant to the two Newmarket officers and they all shook hands.
True asked the defendant if he and Laurent could speak to him without his girlfriend (who had approached the officers) or Relia present, as they wanted to discuss a private matter. True suggested that he, Laurent, and the defendant sit in the Newmarket officers’ vehicle, as it was around *689 thirty-five degrees outside and he and Laurent were not dressed for the outdoors. The defendant, who was dressed for the weather, instead asked whether the three could walk and talk. The officers agreed, and Relia returned to his cruiser, where he remained for the duration of the interview.
The officers followed the defendant’s lead as he began walking around the large open area surrounding the restaurant. As the three began walking, the officers said they wanted to talk to the defendant about his having molested K.L. Laurent told the defendant that he was not under arrest — and repeated this statement two or three times throughout the interview — and that the officers just wanted to get his side of the story. When he was first told why the officers wanted to speak with him, the defendant responded by saying he “did not remember that.” When shown a picture of K.L., however, the defendant smiled, stating that he remembered her and that she was a cute girl. At this point Laurent noticed that the defendant looked very nervous and was shaking, and she asked him whether he was cold. The defendant responded that he was not cold, as he had just been working, and the interview continued.
The officers next asked the defendant multiple background questions: they confirmed that he lived in Newmarket at the time the alleged molestation occurred, and that he dated the woman who ran the daycare that K.L. attended during that time period. When the officers asked the defendant if he had molested other children in Newmarket, the defendant was adamant that he had not. At this point in the questioning the defendant’s breathing became shallow, he continued to shake, and he was chain smoking.
During the conversation, the defendant, accompanied by the officers, walked to different parts of the open field. At one point the defendant began to walk into the woods. In response, True said, “Hold it Tim, we’re not walking out there. I don’t want to leave the sight of the trooper.” At the suppression hearing, True testified that he did not want to go into the woods because neither he nor Laurent was dressed to walk in the woods, the officers did not know the area, and they did not have any radio communications. The defendant made no verbal response to True’s statement, but simply began walking in another direction. At another point during the conversation, the defendant ran out of cigarettes. He walked over to his pickup truck, with the officers following, and retrieved more cigarettes. Afterward, the defendant sat in the driver’s seat of his truck, with his feet hanging out, and the officers stood outside the vehicle, where the three continued the conversation.
The entire conversation with the defendant lasted approximately one hour and fifteen minutes. During this time, the officers and the defendant *690 walked over different parts of the field, covering most of the open ground. Throughout the interview, the defendant and the officers spoke back and forth in a conversational tone, and the defendant often took long pauses to think between answers. Although the defendant never unequivocally denied molesting K.L., at times he claimed not to remember certain events. The defendant often responded to the officers’ questions with questions of his own about the investigation. He asked the officers about the people to whom the police had talked, in what room the abuse was alleged to have occurred, and what evidence the police had. He said that the officers probably had DNA. Sometimes, the officers answered the defendant’s questions, and sometimes they declined, telling him that they could not disclose the details of the investigation.
Although the officers told the defendant several times that they did not believe his claims that he could not remember certain things and thought he was not telling the truth, at no point did the officers raise their voices, nor were they confrontational or hostile toward the defendant.
At one point, Laurent asked the defendant if he had an emotional relationship with K.L. The defendant denied this. True then said, ‘You just wanted to come.” The defendant nodded his head and responded, ‘Yes, that was probably it.” True then asked if the defendant had oral sex with K.L., to which the defendant responded, ‘Yes.” The defendant also admitted that he had digitally penetrated K.L. and had vaginal intercourse with her. At this point, the officers told the defendant that it was good to be honest and that they just wanted to hear his version of events. The defendant did not offer any more details, but said that he regretted his relationship with K.L. After the defendant made these admissions, the officers allowed him to go into the restaurant to speak with his girlfriend and get a soda. Although the officers accompanied the defendant into the restaurant, they did not place him under arrest until after they had left the restaurant. The arrest took place out of sight of the restaurant so as not to embarrass the defendant in front of the patrons inside the restaurant.
II
“Custody entitling a person to Miranda protections during interrogation requires formal arrest or restraint on freedom of movement to the degree associated with formal arrest.” State v. Steimel, 155 N.H. 141, 144 (2007). The defendant does not contend that he had been formally arrested at the time he was questioned by the officers. That being the case, the trial court was required to determine “whether [the defendant’s] freedom of movement was sufficiently curtailed [to constitute the equivalent of arrest] by considering how a reasonable person in [his] position would have understood the situation.” Id. Among the factors which are relevant to this *691 determination are the suspect’s familiarity with the surroundings where the interrogation occurs, the number of officers present, the degree to which the suspect was physically restrained, and the interview’s duration and character. Id.
The trial court determined that the defendant was not in custody and explained its reasoning as follows:
The defendant was familiar with his surroundings, there were only two officers present, and the defendant was not physically restrained. While the encounter lasted between an hour and an hour and a half, it is clear to the Court that the character of the encounter was not fueled by hostility or animus. Rather, the officers allowed the defendant to wander the field, take time to ponder in silence, and to get cigarettes and sit in his truck. . . . [T]his type of freedom afforded the defendant during the interview bears none of the hallmarks of a formal arrest.
In my view, the trial court’s decision was unquestionably correct. In reaching a contrary conclusion, the majority relies upon four factors: (1) the alleged “restraints” placed upon the defendant during the questioning; (2) the fact that the interview was initiated by the police, rather than by the defendant; (3) the fact that, although the defendant was told several times that he was not under arrest, he was not also advised that he was free to terminate the interrogation; and (4) the accusatory nature of the questioning. With respect to the first factor, the majority’s determination that the defendant was restrained during questioning is the most obvious example of its substitution of its version of the facts for the contrary factual findings of the trial court. As to the other factors, although there is no doubt that each of them can, in some circumstances, weigh in favor of a finding of custody, in this case these factors are far outweighed by other factors demonstrating that the defendant was not in custody when he was questioned.
A
The majority asserts that “the officers . . . intervened to prevent the defendant from freely moving about his property”; that True agreed that, from the moment he encountered the defendant, True knew that he was not going to allow the defendant to leave his sight; and that although True never conveyed his intent to the defendant, “his actions — following the defendant everywhere he walked, including when he went to his truck to get more cigarettes — would have conveyed to a reasonable person the reality that the officers did not intend to allow the defendant to leave their sight.” But this is not a fair description of the nature of the officers’ *692 interaction with the defendant. First, when asked if the officers were not going to let the defendant leave their sight, True answered, “/ knew that, yes.” (Emphasis added.) The clear import of this answer is that this was what the officers intended. However, as the trial court found, there is no evidence that they ever communicated this intent to the defendant — the only fact that matters for custody purposes. See Stansbury v. California, 511 U.S. 318, 323-24 (1994). Furthermore, although the majority emphasizes the point more than once, it also is irrelevant that the officers intended to obtain a confession from the defendant, because this fact too was never communicated to him.
More fundamentally, the majority’s description completely ignores the trial court’s finding — again, amply supported by the record — that the defendant “willingly and voluntarily spoke to” the officers, as well as the crucial facts that it was the defendant who proposed that he and the officers talk while walking around his property and that he determined where on the property they would go. Given these facts, rather than the “following the defendant everywhere” characterization used by the majority, a more accurate description of what actually occurred is that the defendant led the officers around his property. The same “spin” can be found in the majority’s description of the defendant going to his truck to get cigarettes. Although the officers did accompany him to his truck, there is nothing in the record to suggest that in retrieving his cigarettes the defendant was intent upon trying to separate himself from the officers or take a break from the interview.[1] Again, from all that appears in the record, the defendant led the officers to his truck while continuing his conversation with them, and indeed, that is what the trial court found.[2] Given the defendant’s suggestion, and the officers’ agreement, that the interview be conducted while the *693 trio walked around the defendant’s property, it is hard to imagine how else their discussion would have occurred other than by the officers accompanying the defendant.
Here, the interview was conducted in surroundings familiar to the defendant: his own home and business. “[S]uch a location generally presents a less intimidating atmosphere than, say, a police station.” Hughes, 640 F.3d at 436; see also United States v. Knowles, 2 F. Supp. 2d 1135, 1144 (E.D. Wis. 1998) (stating that a Customs Office “does not contain the trappings commonly associated with a law enforcement agency, such as uniformed officers milling about or suspects contained in holding cells,” supporting the contention that a reasonable person would have felt free to leave); cf. Yarborough v. Alvarado, 541 U.S. 652, 665 (2004) (identifying questioning at a police station as a factor that weighs towards finding custody). Further, the defendant was never enclosed in a small area inside or outside of a building — the interview took place in a large open field, approximately an acre in size. See Hughes, 640 F.3d at 436 (finding no custody, in part, where nothing in the record showed that the officers either “exploited . .. [the] cozy confines [of the defendant’s home] or invaded the defendant’s personal space”); cf. State v. Dedrick, 132 N.H. 218, 221, 225 (1989) (finding custody, in part, based upon the nature of the interview room, which measured eight feet by eight feet, was windowless, and was lit by a single lamp). That the defendant was very familiar with his surroundings supports the trial court’s finding that the interrogation was noncustodial.
Although three officers went to the Bullmoose on October 22, only two actually conducted the interview, while the third remained apart in his vehicle. See Hughes, 640 F.3d at 436 (stating that the presence of four officers was “impressive but not overwhelming,” particularly where only two officers questioned the defendant while the others remained apart); see also State v. Turmel, 150 N.H. 377, 379, 385 (2003) (finding no custody where, despite the presence of three police cruisers and an unmarked police truck, only two officers interviewed the defendant); State v. Locke, 149 N.H. 1, 6 (2002) (finding no custody where the defendant was questioned by two officers). Because the number of officers who questioned the defendant was not so numerous as to be inherently intimidating, this factor also supports the trial court’s finding of no custody.
At no point during the interview did the officers physically restrain the defendant or otherwise engage in a show of force. The interviewing officers — True and Laurent — were dressed in plain clothes, not police uniforms. Although they were armed, their weapons were covered by their jackets and not visible to the defendant, and at no point did they display or brandish their weapons. See Hughes, 640 F.3d at 436 (finding no custody *694 when, among other factors, the officers did not brandish their weapons, even though they were visible to the defendant); State v. Hammond, 144 N.H. 401, 404 (1999) (finding no custody when, among other factors, the two officers questioning the defendant were not wearing their uniforms and their weapons were not visible to the defendant); Turmel, 150 N.H. at 385 (finding no custody where officers did not display their weapons to the defendant).[3]
The majority seizes upon one isolated incident — True’s response to the defendant’s mid-interview attempt to walk into the woods — as establishing the point, at the latest, by which the defendant was in custody. But, unlike the “sea change in the tenor and character of [the] interview” that the trial court in Dedrick found occurred after the officers reentered the interrogation room, see Dedrick, 132 N.H. at 225, here there is no evidence that this incident had any effect whatsoever on the tenor or character of the interactions between the officers and the defendant. Although this incident was an occasion when the officers apparently directed the defendant where not to go,[4] such a direction is wholly inadequate to demonstrate custody when considered in light of the totality of circumstances. The First Circuit’s decision in Hughes is instructive. There, during an interrogation of the defendant at his home, two troopers accompanied him as he went outside to smoke a cigarette during a break in the questioning. Hughes, 640 F.3d at 436. The court found that “[w]hile escorting a suspect throughout his home may have some bearing on the custody inquiry, there is no evidence that the troopers followed the defendant so closely as to intrude upon any intimate *695 moment or private activity.” Id. (citation omitted). Thus, “their foray into the yard, viewed objectively, did not approach the level of physical restraint associated with formal arrest.” Id.
The same is true here. When the defendant started to walk into, the woods, True said, “Hold it Tim, we’re not walking out there. I don’t want to leave the sight of the trooper.” Neither True nor Laurent made physical contact with the defendant at this point, nor is there evidence that they blocked his path into the woods or otherwise physically redirected his movements in any way. Cf. United States v. Mahmood, 415 F. Supp. 2d 13, 16 (D. Mass. 2006) (when, during interview at defendant’s home, telephone rang, agents did not suggest a break or give any indication it was permissible for defendant to answer, and when defendant turned to approach phone, agent placed herself in front of it); Jennings, 155 N.H. at 770 (after requesting defendant to “voluntarily” come to police station, officers rejected defendant’s request to travel in his own truck, took keys to the truck, and conducted pat-down search of defendant before he entered police cruiser). In the language of Hughes, the officers did not “intrude upon any intimate moment or private activity,” as the defendant at the time was merely endeavoring to steer the collective movement of the trio into the woods. Hughes, 640 F.3d at 436; cf. United States v. Madoch, 149 F.3d 596, 601 (7th Cir. 1998) (finding that presence of agent while suspect pumped breast milk in bathroom was sufficient to establish that she was in custody).[5]
Viewed objectively, True’s response to the defendant’s foray toward the woods did not approach the level of physical restraint associated with formal arrest. The test for custody is not whether the defendant had absolute freedom to move about as he wished — if that were the test, then police questioning of a motorist during a traffic stop would be unlawful in the absence of Miranda warnings, since the motorist obviously is not free to move about as he wishes. Rather, the test is whether a reasonable person in the defendant’s position would have understood himself to be functionally under arrest. See Steimel, 155 N.H. at 144. Not only would a reasonable person not have believed that he was functionally under arrest at that point, *696 but the defendant’s own actions clearly illustrate that he did not regard himself as being under arrest or subject to equivalent restraint. The defendant’s response to True’s statement was simply to walk in another direction, without comment; he did not stop, ask the officers where he should go, or have any other reaction. His conduct demonstrates that the defendant believed he retained control over where the trio walked during the interview, and is wholly inconsistent with the thesis that he regarded himself as being in custody. Nor does the presence of Relia, who merely remained seated in his cruiser some distance away, change the objective reality of this situation. A reasonable person in the defendant’s position, I submit, would think it quite odd that a police officer sitting quietly in a car at varying distances from his location (depending upon where the defendant was at the moment) was exercising dominion and control over him equivalent to that of a person who had been placed under arrest.
To demonstrate the extent to which the majority’s “restraint” analysis deviates from the mainstream of settled law, it is useful to compare the facts of this case with those of cases upon which the majority relies to support its conclusion that this factor supports its finding of custody. The majority cites United States v. Mittel-Carey, 493 F.3d 36 (1st Cir. 2007), in support of its decision, but in fact the circumstances in Mittel-Carey bear little similarity to those here. In Mittel-Carey, eight FBI agents arrived at the defendant’s house at 6:25 a.m. to execute a search warrant for evidence that the defendant possessed and transported child pornography. Two agents entered the defendant’s dark bedroom, where he was asleep; one held a flashlight and an unholstered gun. Mittel-Carey, 493 F.3d at 38. By contrast, in the instant case, two plain-clothed police officers and one State Trooper arrived at the defendant’s place of business during work hours. Although the officers were armed, their weapons were not visible.'
In Mittel-Carey, the agents ordered the defendant to dress and escorted him downstairs from his bedroom. Id. By contrast, in this case, the officers asked to speak with the defendant in private and then suggested that they sit in the officers’ vehicle. Instead, the defendant requested that they walk and talk. The officers then followed the defendant’s lead as he began walking around a large open area surrounding the restaurant. When the defendant ran out of cigarettes, he led the officers to his truck where he retrieved more cigarettes and then sat on the driver’s seat.
In Mittel-Carey, the defendant was told, during the interrogation, that “based on what the agents anticipated finding on his computer and what he had already done he was looking at a lot of jail time.” Id. (quotation and brackets omitted). By contrast, in the instant case, although the officers told the defendant that they were there to talk with him about molesting the victim, they never communicated to him that they had a warrant for his *697 arrest or threatened him with jail time. Indeed, throughout their interaction, the officers and the defendant spoke back and forth in a conversational tone. The defendant often responded to the officers’ questions with questions of his own about the investigation — a circumstance which demonstrates that, far from being cowed by the officers’ presence, he had the presence of mind to attempt to determine how much they already knew. Sometimes the officers answered his questions and sometimes they told him that they could not disclose details about their investigation. At no point did the officers raise their voices or otherwise act in a manner that was hostile or confrontational. The defendant was quiet and often took long pauses to think between answers, and the officers responded in kind by allowing him to do so and by speaking in polite tones.
In Mittel-Carey, the defendant received permission from the agents on three occasions to move from his seated position in the living room. Id. On one occasion, he requested to use the bathroom and was allowed to do so, but was required to leave the door partially open so that an agent could monitor him. Id. at 39. In this case, there is no evidence that the defendant ever felt the need to ask the officers for permission before walking to different parts of the open field or before, at one point, going to his truck, retrieving cigarettes, and then sitting down. The only time the officers told the defendant that he could not walk where he pleased was when he began to walk into the woods. At that point, an officer merely told the defendant that “we’re not walking out there” because the officer did not “want to leave the sight of the trooper.”
The majority also-likens this case to United States v. Colonna, 511 F.3d 431 (4th Cir. 2007). However, in that case, twenty-four FBI agents and a computer forensic technician arrived at the defendant’s home at 6:29 a.m. to execute a search warrant for child pornography. Colonna, 511 F.3d at 433. After the defendant’s parents and sister allowed the agents into the home, two agents went to his bedroom, kicked open the bedroom door, and, at gunpoint, ordered him to dress and come downstairs. Id. According to the defendant, as he attempted to dress, one agent “slammed him into a door jam causing injuries to his spine.” Id. Although the defendant was told that he was not under arrest, he was told twice that lying to a federal agent was a felony. Id. In contrast, nothing remotely approaching this kind of aggressive law enforcement behavior occurred in this case.
In sum, the record before us amply supports the trial court’s finding that “the defendant was the one who decided where the interview occurred] and he was the one who led the officers to different locations on his property.” It is fiction to suggest, as the majority does, that this explicit finding can be squared with its conclusion that the defendant was subjected to restraint of a degree amounting to the functional equivalent of arrest.
*698 B
The majority next relies upon the fact that the interrogation here was initiated by the police, rather than by the defendant himself. Although I agree that this is a factor that weighs in favor of a finding of custody, its significance, under the totality of the circumstances, is minimal. Apparently recognizing as much, the majority attempts to “beef up” this factor by observing that “the defendant was aware that the officers traveled from Newmarket [some three hours away] to confront him.” Exactly how the majority believes the officers’ place of origin or travel time contributes to the custody analysis is unexplained. At best, these considerations might lead a reasonable person to conclude that the officers considered the subject matter of their desired interview with the defendant to be of sufficient importance to justify the trip. I am aware of no authority, however, that suggests the importance which officers attach to a conversation is indicative of custody. In any event, whatever pro-custody value the initiation-of-the-contact factor may have is completely offset by the absence of any evidence of heavy-handed tactics on the part of the officers in securing the defendant’s agreement to be interviewed and by the trial court’s explicit finding — which the majority does not dispute — that the defendant “willingly and voluntarily spoke to Lieutenant True and Sergeant Laurent.”
C
The majority also places great weight upon the fact that, although the officers told the defendant on two or three occasions that he was not under arrest, they did not also inform him that he was free to terminate the interrogation.[6] However, while informing a suspect that he is not under arrest may be “less determinative in favor of non-custody,” United States v. Sanchez, 676 F.3d 627, 631 (8th Cir. 2012), than informing him that he is free to leave, it is, nonetheless, a factor that weighs in favor of — not against — a finding that the defendant was not in custody, id. (citing United *699 States v. Ollie, 442 F.3d 1135, 1138 (8th Cir. 2006), for the premise that, “where interviewer’s statement to suspect that she was not under arrest weighed against custody finding, it was less determinative than a statement informing suspect that answers were voluntary and she was free to leave” (emphasis added)). “[A] statement by a law enforcement officer to a suspect that he is not under arrest is an important part of the analysis of whether the suspect was in custody.”[7] United States v. Swanson, 341 F.3d 524, 530 (6th Cir. 2003) (citation omitted); see also Davis v. Allsbrooks, 778 F.2d 168, 171 (4th Cir. 1985) (informing a suspect that he is not under arrest is one factor courts frequently consider to show lack of custody); United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985) (in finding lack of custody, it was “significant” that the suspect was specifically informed by the officers that he was not under arrest); Smith v. Clark, 2013 WL 4409717, at *7 (E.D. Cal. Aug. 15, 2013) (“We think a reasonable person who is told that he is not under arrest would understand that he is not in custody.”).
Although the majority acknowledges that informing a suspect that he is not under arrest weighs in favor of a finding of non-custody, its analysis then turns this factor upside down by concluding that not also informing the defendant he was free to terminate the interrogation “supports a finding of custody at some point during the interrogation.” (Emphasis added.) No authority supports such an approach.
D
Finally, the majority relies upon the accusatory nature of the interrogation as support for its determination that the defendant was in custody. It finds “that the accusatory questioning and accusatory statements employed by the interrogating police officers each independently weigh in favor of a finding of custody, and further, that concurrently they strongly support such a finding.” This determination cannot be squared with our prior cases.
True and Laurent spoke with the defendant for approximately seventy-five minutes. Ample authority establishes that an interview of this length is not, in itself, sufficient to raise an inference of custody. See, e.g., Hughes, 640 F.3d at 437 (stating that a ninety-minute interview was of á “relatively *700 short” duration); Locke, 149 N.H. at 6 (“The interview’s duration was not excessive: it lasted for three and one-half hours.”).
As for the demeanor of their exchange, the trial court found that “the two officers and the defendant spoke back and forth in a conversational tone,” despite the intense subject matter being discussed. The officers were neither hostile nor confrontational to the defendant, and never raised their voices. To the contrary, the trial court described the officers as “polite,” and determined that “the character of the encounter was not fueled by hostility or animus.” Again this aspect of the interrogation is similar to Hughes, in which the court characterized the interview as non-confrontational despite the fact that the defendant was being questioned about taking nude photographs of a minor in his care —• a subject matter that is similarly intense and unpleasant, like the alleged sexual assault of K.L. that was the topic of discussion here. See Hughes, 640 F.3d at 431, 437; see also Locke, 149 N.H. at 7 (finding no custody where there was “no evidence of shouting or harsh tones at any time during the interview”); Hammond, 144 N.H. at 404 (finding no custody where the officers never became confrontational at any point in the questioning).
Although the interview was non-confrontational in tone, the officers did accuse the defendant of molesting K.L., told him several times that they did not believe his claims of not remembering certain things, and urged him to tell the truth. However, our cases hold that even periods of aggressive questioning during an otherwise non-confrontational interview are not sufficient to convert the interview into custodial interrogation. See, e.g., Steimel, 155 N.H. at 146 (“We have previously held that confrontational questioning did not constitute custody where it occurred briefly during an otherwise casual conversation.” (citation omitted)). That being the case, it should follow a fortiori that the absence of any aggressive or confrontational questioning is an even stronger indication of non-custody.
Our cases also make clear that police interrogation does not become custodial merely because its focus is upon the defendant’s alleged criminal conduct. For example, in State v. Carpentier, we found that the defendant was not in custody even though officers used strong language and loud voices when confronting him about discrepancies between his statements and those of other witnesses. State v. Carpentier, 132 N.H. 123, 127 (1989). We emphasized that “this intense and accusatory questioning lasted less than ten minutes, after [which] the interview again became relatively unconfrontational.” Id. (emphasis added). Similarly, in State v. Carroll, the defendant’s mother, an off-duty police officer, aggressively questioned the defendant at the police station, with three other officers present in the interview room. State v. Carroll, 138 N.H. 687, 689-90 (1994). Both the defendant’s mother and another officer raised their voices at times, and the *701 defendant cried at several points during the interview. Id. at 690. Moreover, two officers present at the interrogation described it as “one of the most emotional and intense interrogations they had ever witnessed.” Id. Nonetheless, we found that, under the totality of the circumstances, the interview was non-custodial. Id. at 696.
In an attempt to reconcile its finding that the accusatory nature of the interrogation rendered it custodial as a matter of law with the trial court’s contrary factual finding, the majority relies upon State v. Dailey, 273 S.W.3d 94, 103 (Tenn. 2009), for the proposition that questioning can be custodial when it is accusatory notwithstanding that the officers’ “tone of voice and general demeanor were conversational.” But, once again, the comparison is unpersuasive because Dailey is readily distinguishable from this case. The first and most obvious distinction is that the questioning in Dailey occurred at the police station, in a small interview room wherein the defendant was seated in the back corner diagonally across from the door in front of which one of the two interrogating officers sat. See Dailey, 273 S.W.3d at 97. Unlike this case, in which the police informed the defendant from the outset of the purpose for their visit, the police in Dailey secured the defendant’s presence at the station through the ruse that they needed to take a second set of “elimination fingerprints” because the defendant worked at the business where the victim’s body was discovered. Id. During the course of the un-warned interview, the officers not only falsely told the defendant that his fingerprints “had been found in a place they shouldn’t have been” and suggested that they had other unspecified forensic evidence of his guilt, but — most significantly for present purposes — they told him that “if they went strictly on the evidence, they would have to charge [him] with first degree murder.” Id. at 98 (quotations omitted). In contrast, until the very end .of the interview, the officers in this case made no statements to the defendant that they could arrest him or that they intended to do so. Given the circumstances in Dailey, it is not at all surprising that the court found that the defendant was in custody at least at the point when the officer made the “if I go strictly on the evidence” statement. See id. at 104. Dailey, however, offers no support for a similar result in this case.
Thus, although I do not dispute that accusatory statements and expressions of disbelief in a suspect’s veracity are factors that cut in favor of custody, we have never held that they alone are sufficient to find that a suspect was in custody — and here, as shown above, there are no other circumstances sufficient to support such a finding. As the United States Supreme Court has explained:
[A] noncustodial situation is not converted to one in which Miranda applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom *702 of movement, the questioning took place in a “coercive environment.” Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question.
Oregon v. Mathiason, 429 U.S. 492, 495 (1977); see also United, States v. Phillip, 948 F.2d 241, 247 (6th Cir. 1991) (“Coercive environments not rising to the level of formal arrest ... do not constitute custody within the meaning of Miranda.” (citation omitted)).
Ill
Virtually all of the cases cited by the majority are relied upon only for general propositions of law, such as that custody is more apt to be found in police-initiated as opposed to suspect-initiated encounters, see ante at 684-85 (citing United States v. Griffin, 922 F.2d 1343, 1351 (8th Cir. 1990)), that the accusatory nature of questioning is a factor that weighs toward a finding of custody, see ante at 681-83 (citing Dedrick, 132 N.H. at 225), and so on. I do not quarrel with these general legal principles. However, what the majority fails to recognize is that many of the cited opinions held that the questioning at issue did not constitute custodial interrogation. See United States v. Salvo, 133 F.3d 943, 953 (6th Cir. 1998); United States v. Lifshitz, 03 Cr. 572 (LAP), 2004 U.S. Dist. LEXIS 18571, at *26 (S.D.N.Y. Sept. 15, 2004); Com. v. Groome, 755 N.E.2d 1224, 1236 (Mass. 2001); Steimel, 155 N.H. at 146; Locke, 149 N.H. at 7; Hammond, 144 N.H. at 404; State v. Graca, 142 N.H. 670, 676 (1998); State v. Johnson, 140 N.H. 573, 579 (1995); Green, 133 N.H. at 258-59; State v. Tucker, 131 N.H. 526, 531 (1989); People v. Henry, 980 N.Y.S.2d 594, 597 (App. Div. 2014).
Above I have detailed the distinctions between this case and a few of the cases relied upon by the majority in which the courts did find custody. However, the reality is that all such cases relied upon by the majority are readily distinguishable from this case,[8] either because they involved station-house interrogation — the core concern that Miranda warnings *703 were designed to ameliorate — or because they involved significantly greater coercive elements than are present here. See United States v. Beraun-Panez, 812 F.2d 578, 579-80 (9th Cir.) (questioning of defendant by two officers occurred out of doors; officers did not tell him he was under arrest nor was he placed in handcuffs; officers accused defendant of starting a fire, falsely told him that witnesses could place him at the scene, demanded to know why he was lying when he denied it, and told him that he could be deported if he “kept lying” or if he was convicted; when a companion, on horseback, approached the scene of the questioning, one of the officers directed him away), modified, 830 F.2d 127 (9th Cir. 1987); United States v. Griffin, 7 F.3d 1512, 1514-15, 1519 (10th Cir. 1993) (defendant was separated from her friend and questioned by single officer in small airport police office; questioning was accusatory; defendant was not told that she could refuse to answer questions, terminate the interview, or leave); Griffin, 922 F.2d at 1346 (defendant was questioned at home; when told agents were investigating bank robbery, the defendant immediately said “the gun wasn’t loaded”; agents told the defendant’s parents they needed to speak with him privately; the defendant was not informed that he was not under arrest or that he could refuse to answer questions, was told to always remain in view of agents, and was accompanied to another room when getting cigarettes); United States v. Wauneka, 770 F.2d 1434, 1437 (9th Cir. 1985) (eighteen-year-old defendant transported to law enforcement office by two armed officers; questioned first by four or five officers and, after a break during which he broke down crying, by two officers; defendant never offered opportunity to leave, told he had information only the perpetrator would know, that he matched the description of perpetrator, and that he better stop lying); White v. United States, 68 A.3d 271, 274-75 (D.C. 2014) (car stop; defendant was not asked for license or registration, was immediately handcuffed and isolated from young son left in car; not told that he was not under arrest); Aguilera-Tovar v. State, 57 A.3d 1084, 1087-90 (Md. Ct. Spec. App. 2012) (after appellant was administered a polygraph test, he was interrogated in windowless interview room at police station where officers confronted him repeatedly and persistently with the fact that he failed the polygraph, accused him of lying, and threatened to inform his wife about the negative test results); Ross v. State, 45 So. 3d 403, 415-17 (Fla. 2010) (defendant came to station voluntarily and was questioned in small room; never told he was free to leave; after initial general questioning, interrogation became confrontational and accusatorial and lasted for hours, during which defendant was repeatedly confronted *704 with evidence against him); Jennings, 155 N.H. at 770-71 (officers met the defendant in the driveway of his residence, asked him to “voluntarily” come to station; after he agreed, insisted that he travel to station in police car rather than his own vehicle, confiscated his car keys and conducted pat-down search of his person; questioned the defendant at the station in a small interview room; officer confronted the defendant with allegations and said he believed them to be true; although the defendant was told he was not under arrest and free to leave, there was no evidence he understood this to be true; when officer left interview room, told the defendant to knock on the door if he needed anything); Dedrick, 132 N.H. at 221-22 (the defendant was questioned at police station in small, windowless room; advised of his Miranda rights, accused of untruths, and confronted with damning information); State v. Hieu Tran, 71 A.3d 1201, 1203-04 (Vt. 2012) (questioning occurred in police cruiser outside the defendant’s home; the defendant was repeatedly confronted with evidence of guilt, was not told he was not under arrest or free to leave, and told not to play with his cell phone); State v. Muntean, 12 A.3d 518, 520-22 (Vt. 2010) (the defendant was questioned in a small, windowless room at the police station; not told he was free to leave; continuously confronted with evidence of guilt and accused of being untruthful).
Thus none of the cases cited by the majority support the result reached by the majority. Simply put, the majority can point to no case in which a court has found police questioning of a suspect to involve custodial interrogation where the questioning takes place outside as the suspect leads officers on a walk-around of his own property, the suspect is informed he is not under arrest, there are minimal — if any — exertions of physical control over the suspect, and the questioning is not aggressive or hostile. In short, the majority’s decision in this case is an outlier in Miranda jurisprudence.
For the above reasons, I respectfully dissent.
DALIANIS, C.J., joins in the dissent.

 The situation might be different if, for example, there was evidence that in seeking to retrieve his cigarettes, the defendant said to the officers something like, “I’m going to get a cigarette, I’ll be back in a second.” If, despite a statement like this, the officers nonetheless accompanied the defendant while he gathered his cigarettes, such actions arguably would suggest to a reasonable person that he was not free to disentangle himself from the police, even for a moment. See United States v. Cavazos, 668 F.3d 190, 194 (5th Cir. 2012) (noting that the defendant was monitored when he used the telephone and restroom); Jennings, 155 N.H. at 770, 773 (noting that when police told the defendant to “knock on the interview room’s door if he needed anything[,]... [t]he implication ... was that [he] could not leave the room, much less the station”). But see Hughes, 640 F.3d at 436 (finding no custody where agents accompanied the defendant outside when he went for a cigarette during a break in questioning).

 There is no evidence, for example, that the officers tried to search the defendant’s vehicle for weapons prior to his entering it to get cigarettes. Cf. Jennings, 155 N.H. at 773 (officers conducted pat-down search of defendant before transporting him to police station).

 The majority asserts that Turmel and other cases involving traffic stops are “of limited application” to the analysis of this case. To the contrary, the significance of Turmel and its progeny is that these cases demonstrate that, even when a person is unquestionably not free to leave (because he has been “seized” during a traffic stop), such level of restriction of freedom is not, without more, enough to require the administration of Miranda warnings before questioning. The seminal question posed by Turmel for the custody question at issue here is this: How likely is it that a motorist, “seized” during a traffic stop, would feel free to roam around his vehicle (or the area where the stop occurs) while being questioned? The answer is obvious; yet legions of cases hold that the mere seizure resulting from a traffic stop does not require administration of Miranda warnings before questioning. Given that the defendant in this case faced nothing remotely resembling the level of restriction on freedom of movement typically imposed on a motorist subject to a traffic stop, the Turmel line of cases strongly supports the conclusion that he was not “in custody” for Miranda purposes.

 Although the trial court interpreted Lieutenant True’s statement as a direction to the defendant that he could not enter the woods or leave the sight of Trooper Relia, the statement is susceptible of a different interpretation. Taken in context, a plausible alternative interpretation is that when True said, “we’re not walking out there” and “I don’t want to leave the sight of the trooper,” he was referencing only what he (or he and Laurent) intended to do, not what the defendant was compelled to do. Nonetheless, in contrast to the majority’s methodology, because the trial court adopted the former interpretation, I accept it for purposes of my analysis.

 The majority acknowledges that police safety concerns can be a valid reason, unrelated to custody, for escorting or placing restrictions on the movement of a person being questioned, but asserts that True’s testimony that such concerns were part of what led him to direct the defendant away from walking into the woods need not be considered because the defendant was not informed that this was the reason for the restriction. Although the defendant may not have been explicitly informed of the reason for not going into the woods, True’s statement, “I don’t want to leave the sight of the trooper” (emphasis added), combined with the defendant’s knowledge that the officers hailed from afar and were unfamiliar with the area, certainly would have communicated to a reasonable person in his position that the officers were concerned for their safety.

 Although some courts appear to regard advice to a person that he does not have to answer questions as a factor that weighs in favor of a finding of non-custody, there is reason to question whether this conclusion is justified. A person subject to police interrogation has no obligation to answer questions whether he is in custody or not. And because advising a person that he does not have to answer questions is one part of the Miranda warnings, and there is authority for the proposition that administering Miranda warnings is a factor that may lead a person to believe he is under arrest or its functional equivalent, see Caldwell v. State, 41 So. 3d 188, 201 (Fla. 2010) (discussing conflicting views of various courts on this point); State v. Green, 133 N.H. 249, 258 (1990) (“[T]he reading of Miranda warnings may be a factor in deciding whether a person is in custody under some circumstances ....”), it is understandable that officers desirous of not creating a custodial atmosphere would think twice before providing such a “Miranda light” warning.

 That the officers had already obtained an arrest warrant for the defendant prior to interviewing him is not relevant to our custody determination, as there is no evidence that the defendant was aware of the warrant. See Berkemer v. McCarty, 468 U.S. 420, 442 (1984) (“A policeman’s unarticulated plan has no bearing on the question whether a suspect was ‘in custody at a particular time; the only relevant inquiry is how a reasonable man in the suspect’s position would have understood his situation.”); see also United States v. Reynolds, 762 F.2d 489, 493 (6th Cir. 1985) (“Since the warrants were unknown to defendants, their existence could not have affected how the defendants understood their position, which is the only relevant consideration under Berkemer!’).

 Even State v. Hieu Tran, 71 A.3d 1201 (Vt. 2012), the ease cited by the majority that arguably presents the factual scenario most nearly analogous to that involved here, is distinguishable in important respects, in that the questioning in that case took place within the confines of a police vehicle, the officers did not inform the defendant either that he was free to leave or that he was not under arrest, and one of the officers told the defendant to stop playing with his cell phone during the interview. See id. at 1203-04. In addition, in Hieu Tran, as in our own Dedrick and Jennings cases, the trial court made a finding that “the circumstances of the questioning created a police-dominated atmosphere,” id. at 1204, and the appellate court merely upheld *703 that finding. In contrast, here the majority substitutes its judgment for the trial court’s express finding that “the interview bears none of the hallmarks of a formal arrest.”